**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ABBA COHEN, JASON CRYSTAL, and MILES CONNORS,<br><br>Defendants. | S1 25 Cr. 444 (GBD) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MILES CONNORS' MOTION TO SUPPRESS**

TREANOR DEVLIN-BROWN PLLC
Arlo Devlin-Brown
230 Park Avenue, Ste. 450
New York, NY 10169
(212) 858-9080

COVINGTON & BURLING LLP
Amanda Kramer
Seema Sabu
30 Hudson Yards
New York, NY 10001
(212) 841-1000

*Counsel for Defendant Miles Connors*

September 8, 2026

## TABLE OF CONTENTS

**I. THE FEDERAL SEARCHES ARE THE FRUIT OF AN UNLAWFUL COUNTY SEARCH OF MR. CONNORS' PHONE. ....8**

**A. The Suffolk Phone Warrant Was Unlawful. ....9**

**B. The Government Has Not Shown an Independent Source for Its Own Warrants. ....11**

**II. INDEPENDENTLY, THE FEDERAL AFFIDAVITS DO NOT ESTABLISH PROBABLE CAUSE TO SEARCH MR. CONNORS' ACCOUNT OR PHONE. ....14**

**A. Nothing in the Affidavit Connects the Account to Evidence of a Crime. ....14**

**B. The "Traveler" Label Cannot Fill the Gap. ....16**

**C. The Later Warrants Add Nothing. ....18**

**III. THE GOOD-FAITH EXCEPTION DOES NOT SAVE THE FEDERAL WARRANTS. ....19**

**IV. THE COURT SHOULD HOLD AN EVIDENTIARY HEARING. ....21**

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alderman v. United States*,
394 U.S. 165 (1969) ... 3, 11

*Carpenter v. United States*,
585 U.S. 296 (2018) ... 3

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971) ... 11

*Elkins v. United States*,
364 U.S. 206 (1960) ... 3

*Illinois v. Gates*,
462 U.S. 213 (1983) ... 2, 14

*Marks v. Clarke*,
102 F.3d 1012 (9th Cir. 1996) ... 18

*Murray v. United States*,
487 U.S. 533 (1988) ... 3, 11, 12, 13

*Rakas v. Illinois*,
439 U.S. 128 (1978) ... 3

*Reid v. Georgia*,
448 U.S. 438 (1980) ... 18

*Riley v. California*,
573 U.S. 373 (2014) ... 3

*Silverthorne Lumber Co. v. United States*,
251 U.S. 385 (1920) ... 9, 14

*United States v. $31,990 in U.S. Currency*,
982 F.2d 851 (2d Cir. 1993) ... 18

*United States v. Banyan*,
791 F. Supp. 3d 388 (S.D.N.Y. 2025) ... 9, 10, 14, 16

*United States v. Bertini*,
No. 23 Cr. 61 (PGG), 2023 WL 8258334 (S.D.N.Y. Nov. 29, 2023) ... 10, 16, 22

*United States v. Eng*,
971 F.2d 854 (2d Cir. 1992) ... 12, 13, 21

*United States v. Galpin*,
720 F.3d 436 (2d Cir. 2013) ... 3, 10

*United States v. Garcia*,
No. 20-CR-00058 (KAD), 2023 WL 4850553 (D. Conn. July 28, 2023) ... 10

*United States v. Guzman*,
No. S5 97 Cr. 786, 1998 WL 61850 (S.D.N.Y. Feb. 13, 1998) ... 10

*United States v. Johnson*,
994 F.2d 980 (2d Cir. 1993)....12

*United States v. Lauria*,
70 F.4th 106 (2d Cir. 2023) ....3, 15

*United States v. Leon*,
468 U.S. 897 (1984)....3, 19, 21

*United States v. Manuchekhri*,
No. 25-cr-88, 2026 WL 947658 (E.D.N.Y. Apr. 8, 2026)....16

*United States v. Pena*,
961 F.2d 333 (2d Cir. 1992)....4, 21

*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996)....18, 20

*United States v. Rosa*,
626 F.3d 56 (2d Cir. 2010)....10

*United States v. Rosario*,
918 F. Supp. 524 (D.R.I. 1996)....10

*United States v. Rubio*,
727 F.2d 786 (9th Cir. 1983) ....19

*United States v. Silva*,
146 F.4th 183 (2d Cir. 2025) .... *passim*

*United States v. Weber*,
923 F.2d 1338 (9th Cir. 1990) ....18

*United States v. Wey*,
256 F. Supp. 3d 355 (S.D.N.Y. 2017)....10

*United States v. Zemlyansky*,
945 F. Supp. 2d 438 (S.D.N.Y. 2013)....10

*Wong Sun v. United States*,
371 U.S. 471 (1963)....3, 9, 14, 18

*Ybarra v. Illinois*,
444 U.S. 85 (1979)....17

**Other Authorities**

Statement by An Taoiseach Enda Kenny TD on the Recognition of Travellers as
an Ethnic Group, Dáil Éireann (Mar. 1, 2017) ....17

Equal Status Act 2000 (Ir.), s. 2(1) ....17

Race Relations (Northern Ireland) Order 1997, art. 5 ....17

Edmund Gilbert et al., *Genomic Insights into the Population Structure and
History of the Irish Travellers*, 7 Sci. Rep. 42187 (2017) ....17

## PRELIMINARY STATEMENT

Miles Connors moves to suppress everything the government took from his iPhone and his iCloud account. The three federal warrants under which it took that evidence were built on searches by Suffolk County that violated his Fourth Amendment rights, and even on their own terms the federal applications did not establish grounds to search his phone or his account.

The federal case against Mr. Connors began as a county misdemeanor. In June 2024, Suffolk County was investigating him for doing home improvement work without a county license. When he was arrested that month on an unrelated warrant, the county kept his iPhone and, nine days later, obtained an extraordinarily broad warrant to search everything on it for proof of the licensing misdemeanor. The Suffolk application offered no fact connecting the phone to that offense, and the warrant impermissibly authorized the seizure of the phone's entire contents—every message, photograph, contact, bank record, and location, without limit of time. The county imaged the phone in full and kept the image. Then, on the basis of what it had read on the phone, it obtained a warrant for his iCloud account and kept those returns as well.

The money-laundering investigation that produced this case—opened months later around other people—received the county's work: the extraction, the Apple returns, and the applications and analyses the county had built from them. Federal agents reviewed the results of the county's unconstitutional search—including Apple returns from outside the period that the county's warrant had covered. Then, in September and October 2025—apparently recognizing that the county's warrants would not withstand scrutiny—the government obtained warrants of its own: for the iCloud account the county had identified from the phone, for the county's copies of its Apple returns, and for the county's extraction of the phone itself. Those warrants cured nothing. They rest on what the county's illegal search produced, and they have defects of their own. The thirty-three-page affidavit on which all three depend is about four other men. It mentions Mr. Connors

in a handful of paragraphs, alleges no communication by him with anyone, and relies on unsupported claims, copied from unrelated warrant affidavits, that treat Mr. Connors' identity as a Traveler—an ethnic minority recognized as such by the Government of Ireland—as relevant to whether he committed the charged crimes.

The evidence should be suppressed on two independent grounds. First, the federal searches are the fruit of Suffolk County's unlawful search of the phone: the county's warrant issued without any fact connecting the phone to the offense under investigation, and it authorized the seizure of everything on the phone without limit of time. The government reviewed what that search produced before it sought any warrant of its own, and it has not shown—and on this record cannot show—that its own warrants had a source independent of the county's search. Second, independently, the federal affidavits do not establish probable cause to search Mr. Connors' account or phone. The good-faith exception does not save the federal warrants, and the questions of fact on which the government's claim of independence depends requires at minimum an evidentiary hearing.[1]

## APPLICABLE LAW

A warrant may issue only where the affidavit establishes "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause to arrest a suspect does not necessarily amount to probable cause to search his cell phone," and the affidavit must establish "probable cause that the location to be searched contains relevant evidence of the criminal conduct." *United States v. Silva*, 146 F.4th 183, 190, 192 (2d Cir. 2025). Where one application seeks records for several people, the affidavit

[1] Mr. Connors separately moves to sever his trial from that of his co-defendants. That motion is addressed in a separate memorandum of law.

must contain facts linking the particular person to the particular records sought; facts about his associates do not supply them. *United States v. Lauria*, 70 F.4th 106, 128–29 (2d Cir. 2023).

A warrant must also describe the things to be seized with particularity, and "the particularity requirement assumes even greater importance" for digital devices, *United States v. Galpin*, 720 F.3d 436, 445–47 (2d Cir. 2013), which hold "[t]he sum of an individual's private life." *Riley v. California*, 573 U.S. 373, 394 (2014). A warrant that authorizes the seizure of everything on a device, untethered to the offense that justified it, is the general warrant the Fourth Amendment forbids. *See Galpin*, 720 F.3d at 445.

Evidence obtained by exploiting an unlawful search is suppressed with the search, *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963), and it makes no difference that state officers conducted the search and federal officers seek to use what it produced, *Elkins v. United States*, 364 U.S. 206, 223–24 (1960).[2] Once the defendant shows the primary illegality and a connection between it and the challenged evidence, the government bears the burden of proving that the evidence came from a "genuinely independent source." *Murray v. United States*, 487 U.S. 533, 542 (1988); *Alderman v. United States*, 394 U.S. 165, 183 (1969).

Evidence seized under an invalid warrant may nonetheless be admitted where the officers' reliance on the warrant was objectively reasonable, *United States v. Leon*, 468 U.S. 897, 922 (1984)—but not where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth,"

[2] A person whose own phone or account has been searched may move to suppress what the search produced. *Rakas v. Illinois*, 439 U.S. 128, 143 & n.12 (1978). Mr. Connors has submitted a declaration stating that the phone and the iCloud account searched here are his and that he consented to none of the searches, including the search of the county's copy of his account records. Declaration of Miles Connors, dated September 4, 2026 ("Connors Decl.") ¶¶ 3–5, 7–10, 12. He has standing to challenge each search. *See Riley*, 573 U.S. at 393–97; *Carpenter v. United States*, 585 U.S. 296, 310–13 (2018).

where the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or where the warrant was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 923. And where the defendant's papers raise contested issues of material fact bearing on the validity of a search, the court resolves them at an evidentiary hearing. *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992).

## RELEVANT FACTS

On June 17, 2024, New York State Police arrested James Hanrahan, a Suffolk County contractor, for stealing a wheelbarrow from a Lowe's. Ex. 5 ¶ 12.[3] The wheelbarrow was in the back of Mr. Hanrahan's pickup truck, which Mr. Connors was driving. When the officers identified Mr. Connors, they found that he had an open warrant from Pennsylvania in an unrelated matter—an alleged theft of services from a water park—and arrested him on it. His iPhone was "secured with CONNORS' property." *Id.*

*The Suffolk Phone Warrant.* Nine days after the arrest, an investigator in the Suffolk County District Attorney's Office applied for a warrant to search the phone "as evidence for a violation of Suffolk County Code § 563-17 A, an unclassified misdemeanor." Ex. 5 at 1. The alleged crime: performing home improvements without a license. As probable cause for the offense, the application attached a sworn statement from L.P., a Lake Grove homeowner, describing roofing work that Mr. Connors and Mr. Hanrahan had done at his home, and a county affidavit that Mr. Connors held no license. *Id.* ¶¶ 13–16. The application offered nothing to show that evidence of that offense would be found on the phone. The homeowner's statement does not mention a phone; every event it describes happened in person. Ex. 5, Ex. A. The one telephone

[3] Exhibits cited as "Ex. __" are attached to the Declaration of Seema Sabu submitted with this motion, which also serves Mr. Connors' motion to sever.

number in the application was on a postcard the homeowner had been handed, advertising "JH Contractors and Repairs"—Mr. Hanrahan's initials—which the county affiant misleadingly described as "a telephone number to contact CONNORS," *id.* ¶ 19, never disclosing that it was not the number of the phone the county was asking to search. It was Mr. Hanrahan's number: a prepaid line that Mr. Hanrahan had given the State Police as his own contact number, as the county's later applications record. Ex. 7 ¶ 29; Ex. 4 ¶ 47. The only thing in the application that connected Mr. Connors' phone to anything was the affiant's statement, from "training and experience," that a contractor "would utilize a cellphone for his home improvement business," "would have utilized a cellphone to order and coordinate the delivery of dumpsters," "would have additionally utilized a cellphone to coordinate the workers," and that a record "would generally be stored" on the phone. Ex. 5 ¶¶ 17–21. Three weeks later, the same office filed the same paragraphs, with "HANRAHAN" substituted for "CONNORS," to search Mr. Hanrahan's phone. Ex. 8 ¶¶ 30–34.

The warrant issued on June 26, 2024 (the "Suffolk Phone Warrant"). It authorized the "retention, search and analysis" of the phone for "data tending to show additional evidence of the planning and participation in" the licensing misdemeanor and conspiracy to commit it—and then defined the data to be seized as "any and all" of what a phone holds: every message, photograph, and video; every contact; "credit card account information, banking information"; "GPS locations"; "incoming and outgoing phone calls"; "mobile application usage"; "all records, in whatever form found, that tend to establish communication between co-conspirators"; and "any items showing ill-gotten gains." Ex. 5 at 1–2. It contained no limitation of time. The warrant thus did not merely authorize a search of the phone for evidence of the licensing offense; it declared the phone's entire contents to be that evidence and authorized their seizure and retention. The

county extracted the phone's contents in full and loaded the extraction onto a hard drive. Ex. 2 ¶¶ 7–8.

*The Suffolk iCloud Warrant.* The search of the phone gave the county the phone's number and the Apple ID of Mr. Connors' iCloud account: "The search and analysis of CONNORS' iPhone revealed that the telephone number associated with the iPhone is (631) 816-9911 and the Apple ID and email for the iCloud associated with the iPhone is mileyconnors18@icloud.com." Ex. 7 ¶ 24; Ex. 8 ¶ 20. On that identification, and on videos, messages, and contacts read from the phone, the county obtained a warrant for the iCloud account limited to three weeks of data, May 29 through June 18, 2024 (the "Suffolk iCloud Warrant").[4] Ex. 7 ¶¶ 24–34. Apple's returns went onto the same hard drive as the extraction. Ex. 3 ¶ 5.

*The federal warrants.* The federal investigation, by IRS Criminal Investigation ("IRS-CI"), dates from "in or about October 2024," Ex. 1 ¶ 20—the month in which the county, on the basis of what it had read on the phone, obtained warrants for the iCloud accounts of Cohen, Crystal, and Shaulov, Ex. 3 ¶ 4; Ex. 4. At some point the record does not fix, federal authorities received the county's work product: the extraction, Apple's returns, and the county's own warrant applications and the analyses in them. Ex. 2 ¶¶ 8–9; Ex. 3 ¶¶ 5–6; see Ex. 1 at 13 n.2. The government concedes that the county's returns "were shared with IRS-CI" and that, before it sought any warrant of its own, IRS-CI "reviewed the returns." Ex. 1 at 13 n.2. It concedes more than that. IRS-CI reviewed "returns falling outside the Time Period," *id.*—that is, data from outside the three-week window that was the only period any court had authorized anyone to search. That review was itself a search

[4] The county in fact obtained two warrants for the account on the same showing. The first, issued July 18, 2024, was never served on Apple within the ten days New York law allows, so the county applied again and obtained the second on August 12, 2024. Ex. 7 at 23–24; Ex. 8 ¶¶ 20–29.

that no warrant permitted. After it, IRS-CI obtained three federal warrants that reached Mr. Connors' data.

On September 19, 2025, IRS-CI obtained a warrant for the full contents of six iCloud accounts, Mr. Connors' among them, as evidence of wire fraud, money laundering, and conspiracy to commit each (the "Federal iCloud Warrant," Ex. 1). The thirty-three-page affidavit is about four "Money Laundering Subjects"—Cohen, Crystal, Eli Shaulov, and Ephraim Yurowitz—who by the government's account received "at least approximately $71 million in fraud proceeds from dozens of victims," and, attached to them as "Traveler Subjects," two contractors: Mr. Connors and Mr. Hanrahan. Ex. 1 ¶¶ 20, 22, 24. It identifies Mr. Connors' account—"Subject Account-5" in the affidavit, the "Connors iCloud Account" here—by the telephone number the county had learned from the phone, (631) 816-9911. *Id.* ¶ 2 & n.1. The affidavit says little about Mr. Connors beyond that. It states that he "is a Traveler"—a term the affidavit uses as shorthand for a supposed criminal group, and which in fact denotes an ethnic community recognized as such by the Government of Ireland—and that he owns and operates seven named contracting entities, *id.* ¶ 22(e), and it recounts two homeowners' descriptions of in-person dealings with him, *id.* ¶¶ 29, 32. The affidavit refers to an analysis of telephone calls among "the Subjects"; that analysis shows no communication by Mr. Connors with anyone. *Id.* ¶ 38. A footnote discloses the county's iCloud warrants and the federal review of their returns, but claims: "This warrant application does not rely on any facts gleaned from the Suffolk Warrants, whether inside or outside the Time Period." *Id.* at 13 n.2.

On September 27, 2025, IRS-CI obtained a warrant to search—again—the county's copies of Apple's returns for that account and others, which it had already reviewed without any warrant of its own (the "Federal Drive Warrant," Ex. 3). Its probable cause is the September 19 affidavit,

"incorporated by reference as if fully stated herein"; it adds no fact about Mr. Connors. Ex. 3 ¶¶ 9–12.

On October 10, 2025, IRS-CI obtained a warrant to search the county's extraction of the phone for the same federal offenses (the "Federal Phone Warrant," Ex. 2). Ex. 2 ¶¶ 3, 8–10. The affidavit incorporates the September 19 affidavit, *id.* ¶ 13, and adds little: the indictment, *id.* ¶ 12; a description of what agents had already found in the Connors iCloud Account under the Federal iCloud Warrant, *id.* ¶ 16; and training-and-experience paragraphs about contractors' phones, *id.* ¶¶ 15, 17–18. The one fact it added that purported to connect Mr. Connors to a telephone was false. The homeowner L.P. had been handed a postcard for "JH Contractors and Repairs" bearing Mr. Hanrahan's number. The affidavit falsely described it as "a flier advertising Connors' purported home improvement business and listing a phone number to contact Connors." *Id.* ¶ 4(a). The county's own applications, which the government had received and the terms of which its affidavits recite, had recorded a year earlier that the number was Mr. Hanrahan's. Ex. 7 ¶¶ 26, 29; Ex. 4 ¶ 47; *see* Ex. 1 at 13 n.2; Ex. 3 ¶ 4.

## ARGUMENT

The evidence should be suppressed for two independent reasons. The federal warrants are the fruit of an unlawful Suffolk County search of Mr. Connors' phone, and the government has not shown an independent source for them. And taken on their own terms, the federal affidavits do not establish probable cause to search his account or his phone.

### I. THE FEDERAL SEARCHES ARE THE FRUIT OF AN UNLAWFUL COUNTY SEARCH OF MR. CONNORS' PHONE.

Each federal warrant searched the county's product—the extraction of the phone, or the county's copies of Apple's returns—or an account the county identified from the phone. The county's search was unlawful: its warrant should not have issued, and its scope exceeded any

showing the application made. The government concedes that it reviewed the county's material—going beyond even what the county's warrants had authorized—before it obtained any warrant of its own. What it has not shown, and cannot show, is that its own warrants had a source independent of that search. What the federal warrants produced must therefore be suppressed as its fruit. *Wong Sun*, 371 U.S. at 484–88; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *see also United States v. Banyan*, 791 F. Supp. 3d 388 (S.D.N.Y. 2025) (suppressing the returns of Apple and Google account warrants as the fruit of an unlawful phone search).

**A. The Suffolk Phone Warrant Was Unlawful.**

The Suffolk application established, through the statement of the homeowner L.P., probable cause to believe that a man L.P. identified as Mr. Connors had done roofing work at his house without a county license. It established nothing about the phone. L.P.'s statement does not contain the word "phone"; every event it describes happened in person, at his house or at his bank. Ex. 5, Ex. A. No other evidence, from any source, linked the phone in the county's custody to Mr. Connors' contracting work, let alone to a crime. The one telephone number in the application pointed at a different phone and a different man: the affiant told the court that the "JH Contractors and Repairs" postcard listed a number "to contact CONNORS," Ex. 5 ¶ 19, when the number was Mr. Hanrahan's, Ex. 7 ¶ 29; Ex. 4 ¶ 47—and was not the number of the seized phone. With no fact tying the phone to anything, the application fell back on the affiant's account of how contractors do business: Mr. Connors, it was assumed, "would utilize a cellphone for his home improvement business," and a record of that use "would generally be stored" on it. Ex. 5 ¶¶ 17–21.

The law does not permit a search on that basis. An affiant's training and experience can supply the link between a crime and a phone only "where it is combined with enough other specific, factual allegations that tend to link the alleged criminal conduct to the place to be searched." *Silva*,

146 F.4th at 190. In *Silva* those allegations were present: an informant placed the defendant in the street gang charged as a racketeering enterprise, and the affidavit tied him to credit cards linked to fake identities. *Id.* at 192. Even so, the court "stress[ed], however, the limitations of [its] holding." *Id.* Courts in this District have rejected warrants for phones and phone records that rested, as this one did, on nothing more. "[B]lanket generalization[s] about how 'people who commit crimes' act" are "not sufficient," *United States v. Bertini*, No. 23 Cr. 61 (PGG), 2023 WL 8258334, at *9 (S.D.N.Y. Nov. 29, 2023) (quoting *United States v. Garcia*, No. 20-CR-00058 (KAD), 2023 WL 4850553, at *7 (D. Conn. July 28, 2023)); *accord Banyan*, 791 F. Supp. 3d at 395, because a warrant "based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect," *United States v. Guzman*, No. S5 97 Cr. 786, 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998) (quoting *United States v. Rosario*, 918 F. Supp. 524, 531 (D.R.I. 1996)).

The warrant also failed for want of particularity. A warrant must confine the seizure to what the showing justifies, and one that authorizes the seizure of every category of data on a device, without tying the categories to the offense, lacks the particularity the Fourth Amendment requires. *Galpin*, 720 F.3d at 445–47; *see also United States v. Rosa*, 626 F.3d 56, 61–62 (2d Cir. 2010) (warrant that authorized seizure of every category of electronic media and was "defective in failing to link the items to be searched and seized to the suspected criminal activity"); *United States v. Wey*, 256 F. Supp. 3d 355, 380–89 (S.D.N.Y. 2017) (suppressing evidence where warrants authorized seizure of broad categories of business records and devices with no meaningful limitation to the suspected offense); *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 453–64 (S.D.N.Y. 2013) (same). The problem with this warrant is not that it permitted the county to look

through the phone for evidence of the licensing offense; it is that the warrant declared "any and all" of what a phone holds—every message, photograph, and contact; banking and credit-card information; GPS locations; call logs; application data—to be that evidence, and authorized its seizure and retention, with no limit of time. Ex. 5 at 1–2. The list was not drawn from anything L.P. said; it was the affiant's generic recital of what "evidence of crimes" found "in cellular telephones used by perpetrators" may include, repeated word for word from his training-and-experience paragraph. *Id.* ¶ 24. A warrant that lets officers take and keep a man's banking records and his movements by GPS, for all time, to prove that he lacked a county contracting license, is the "general, exploratory rummaging in a person's belongings" the particularity requirement exists to prevent. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

**B. The Government Has Not Shown an Independent Source for Its Own Warrants.**

The connection between the county's search and the federal searches is on the face of the government's own applications. The Federal iCloud Warrant identifies the Connors iCloud Account by the telephone number (631) 816-9911, Ex. 1 ¶ 2, and the only source of that number anywhere in the record is the county's search of the phone, Ex. 7 ¶ 24. The federal affidavit gives no other source. The Federal Drive Warrant and the Federal Phone Warrant searched the county's product itself. That shifts the burden to the government. *Alderman* holds that a defendant who establishes the unlawful search and a connection between it and the challenged evidence has done what is required of him; the government then bears the ultimate burden of persuasion to show that its evidence has an untainted source. 394 U.S. at 183. And *Murray*'s rule has two parts: a later warrant is an independent source only if the government proves both that "the warrant [was] supported by probable cause derived from sources independent of the illegal" search and that "the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal

conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993) (citing *Murray*, 487 U.S. at 542). The question is whether the warrant "would have been sought even if what actually happened had not occurred." *Murray*, 487 U.S. at 542 n.3. The government must therefore prove that it identified the Connors iCloud Account, decided to search it, and established probable cause to do so from sources other than the county's material. It cannot.

The derivation does not stop at the account number. The county's file did not consist of the extraction and the Apple returns alone; it held the county's own analysis of what it had read on the phone. From that analysis, the county built the theory—set out in its October 2024 application for the iCloud accounts of Cohen, Crystal, and Shaulov—that Mr. Connors, Mr. Hanrahan, and Cohen "have conspired" with Crystal. Ex. 4 ¶¶ 84–101, 118. That application is the first document in the record to connect Mr. Connors to Cohen or Crystal at all, the connection it describes is the only one the government has ever identified, and the county built it on what it read on the phone. The government received that file and reviewed it. Then it applied for a warrant to search Mr. Connors' iCloud account for evidence of a money-laundering conspiracy with those men—on an affidavit that recites no contact between Mr. Connors and any of them, and gives no reason, apart from what the county had found, why anyone would think his account held evidence of such a conspiracy. The reason existed. It was in the county's analysis, and the affidavit's silence about it is not the silence of an affiant who did not know.

Nor would it matter if the government, having read the county's analysis, had then set out to confirm it by other means—by subpoena, by interview, or by a warrant of its own. In the neighboring inevitable-discovery context, the Second Circuit has said that an investigation "'trigger[ed]' or 'catalyzed' by information unlawfully gained" is tainted, *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992); subpoenas "must not serve as an after the fact 'insurance policy'

to 'validate' an unlawful search," *id.* at 861–62; and a warrant is an independent source only if the decision to seek it was not prompted by what the unlawful search revealed, *Murray*, 487 U.S. at 542. The government cannot un-know what it read. Having reviewed the county's file, it could not decide which accounts to place in a six-account application, or what to look for in Mr. Connors', as though it had never seen that file.

The government's answer to all of this is one sentence in a footnote: "This warrant application does not rely on any facts gleaned from the Suffolk Warrants, whether inside or outside the Time Period." Ex. 1 at 13 n.2. That is a claim of independent source, and such a claim must be proved—through "particularized findings" as to "each piece of evidence," measured from "the progress of the investigation at the time of the government misconduct," with the agent's own account of what he would have done "not necessarily conclusive." *Cf. Eng*, 971 F.2d at 856, 861–62 (requiring such findings before evidence may be admitted under the neighboring inevitable-discovery exception); *see Murray*, 487 U.S. at 542. The footnote proves nothing. It does not say who reviewed the county's returns or what they found, and it does not say how the government came to identify the Connors iCloud Account, decide to search it, or fix the period to be searched. The record set out above answers each of those questions, and the answer is the county. The government's own conduct confirms it: had it believed the county's searches lawful, it could simply have continued reviewing what the county had given it, but it applied instead for three warrants of its own—for the account the county had identified, for the county's returns, and for the county's extraction. A disclaimer of reliance from an agency that reviewed the county's evidence, adopted its identifiers, and searched its product is not plausible on its face. At a minimum, it is a contested question of fact that the government must answer at a hearing, not in a footnote.

Accordingly, what the federal warrants produced must be suppressed as the fruit of the county's unlawful search. *Wong Sun*, 371 U.S. at 484–88; *Silverthorne*, 251 U.S. at 392; *Banyan*, 791 F. Supp. 3d 388.

## II. INDEPENDENTLY, THE FEDERAL AFFIDAVITS DO NOT ESTABLISH PROBABLE CAUSE TO SEARCH MR. CONNORS' ACCOUNT OR PHONE.

Even read as though the county's search had never happened, the September 19 affidavit supporting the Federal iCloud Warrant does not establish a fair probability that evidence of wire fraud or money laundering would be found in the Connors iCloud Account, and the two later affidavits add nothing that does.

### A. Nothing in the Affidavit Connects the Account to Evidence of a Crime.

A warrant to search an account requires two showings: probable cause that a crime was committed, and probable cause that evidence of it will be found in the account. *Gates*, 462 U.S. at 238; *Silva*, 146 F.4th at 190. The September 19 affidavit is thirty-three pages about the first, and nearly all of it concerns other men. Its narrative is the story of the "Money Laundering Subjects"—Cohen, Crystal, Shaulov, and Yurowitz—their entities and bank accounts, ten victims and where their money went, the warnings that put Cohen on notice, and the "at least approximately $71 million" they are said to have taken in. Ex. 1 ¶¶ 20–35. Mr. Connors is an incidental figure in it. What the affidavit says about him would fit on a page: that he owns contracting businesses, *id.* ¶ 22(e), and that two homeowners dealt with him in person—one who paid Mr. Connors by check for a roof in July 2020, and the other who was pitched for the job at his door, had his roof removed, and was driven to the bank by someone else, *id.* ¶¶ 29, 32. Assume, for the sake of argument, that those paragraphs supply probable cause that Mr. Connors committed a crime. They say nothing about the second showing—whether evidence of that crime is in his iCloud account—and nothing else in the affidavit does so.

As a starting point, the Federal iCloud Warrant affidavit alleges no message, call, email, photograph, or record by Mr. Connors; no communication between him and any Money Laundering Subject, co-worker, or homeowner; and no use of the account at any time. Neither homeowner describes a call, a text, or any dealing with him that was not face to face. *Id.* ¶¶ 29, 32. The affidavit does not even identify the "first known victim payment involving Connors" from which it measures the period it asked to search. *Id.* ¶ 42(e). The descriptions of face-to-face conduct—a pitch at a door, a roof replaced, a check handed to a partner, a check written to Mr. Connors himself five years earlier—contain no information about a message, call, photograph, record, or account. And in an application for six accounts, the showing as to the other five does not carry this one: "[t]he mere fact that persons know each other does not make it probable that they are criminal confederates." *Lauria*, 70 F.4th at 129.

What the affidavit offers in place of a fact is a generalization built on a misdirection. Under the heading "The Subjects' Communications," it reports some 3,000 telephone calls among Cohen, Crystal, Shaulov, Yurowitz, and a fifth man. Ex. 1 ¶ 38. It then reasons that "individuals like the Subjects who are involved in fraud and money laundering offenses—particularly where such individuals are known to communicate with each other often, as shown above—often communicate by email and/or text message," store records on their devices, and back them up to iCloud. *Id.* ¶¶ 39–41. Mr. Connors is one of "the Subjects." *Id.* ¶¶ 20, 22. A magistrate reading those paragraphs would take him to be among the individuals "known to communicate with each other often." What the affidavit does not say—what a reader would learn only by checking the call analysis name by name—*is that not one of those calls was to or from Mr. Connors*. The affiant examined the phone records, reported the calls of five men, and had none to report for Mr. Connors; then he wrote a paragraph that treats Mr. Connors as one of the men whose calls he had reported.

All that remains is the proposition that a contractor probably keeps job photographs and customer contacts on his phone and backs them up to iCloud. *Id.* ¶¶ 40–41. That is true of every contractor with an iPhone. It is a "blanket generalization" that cannot, without a linking fact, support a search, *Bertini*, 2023 WL 8258334, at *9; *accord Banyan*, 791 F. Supp. 3d at 395; *see Silva*, 146 F.4th at 190 (expertise supports a nexus only in combination with case-specific allegations linking the conduct to the place to be searched); *cf. United States v. Manuchekhri*, No. 25-cr-88, 2026 WL 947658, at *3 (E.D.N.Y. Apr. 8, 2026) (nexus established where the affidavit showed that the defendant "in fact did communicate by telephone in furtherance of the crimes with at least two people").

**B. The "Traveler" Label Cannot Fill the Gap.**

The affidavit papers over the absence of any fact about Mr. Connors' account by placing him in a group. Its subject, it announces, is "The Traveling Conmen Fraud Group (also known as the 'Irish Travelers,' and referenced herein as the 'Travelers')"—supposedly a "decentralized groups of United Kingdom and Irish nationals who enter the United States, often illegally, and commit home construction fraud targeting elderly victims." Ex. 1 ¶ 20. A background section describes what "the Travelers" do. *Id.* ¶ 21. Then comes the affidavit's one sentence description of Mr. Connors: he "is a Traveler." *Id.* ¶ 22(e). How the affiant decided who is a "Traveler" is in a footnote: "[f]or simplicity, this warrant application refers to individuals believed—on the basis of their accents, appearance, statements, and/or work as construction workers or contractors—to be Irish or United Kingdom nationals as 'Travelers.'" *Id.* at 14 n.3. The victim paragraphs apply the label on exactly that basis: "three construction workers who appeared to be Travelers," *id.* ¶ 25(a); "an apparent Traveler—based on his foreign accent and subsequent conduct," *id.* ¶ 26(a).

Homeowners, in short, described men with Irish accents who did construction work, and the affidavit made of them a criminal "Group."

Nothing in the applications suggests that the affiant had evidence of an actual organization. In fact, there is one strong indication that the affiant knew nothing about the supposed organization at all: the same description of "Travelers" appears, nearly word for word, in affidavits filed by agents of a different agency in a different district months earlier. Exs. 9, 10.[5]

The only group to which the record shows Mr. Connors belongs is a real one, and it is an ethnic minority. The Government of Ireland formally recognizes "Travellers" as "a distinct ethnic group within the Irish nation"; Irish and United Kingdom law define the Traveller community and protect it from discrimination as such; and geneticists have traced the community's divergence from the settled Irish population.[6] The imputation that a man's membership in an ethnic community is evidence that he committed a crime, is improper, and it cannot supply what the affidavit lacks. Probable cause must be "particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). A profile that pairs an ethnicity or national origin with a kind of crime particularizes nothing. The Second Circuit has rejected such a profile as a basis for probable cause because it "describes a 'large category of presumably innocent travelers'" and is "of little

---

[5] Affidavit of HSI Special Agent Jodie L. Donaghy at 2 n.1, *United States v. Gavin*, No. 1:25-cr-00015 (D.R.I. Jan. 30, 2025), ECF No. 6 (Ex. 9); Affidavit of HSI Task Force Officer Kurt Ripke at 3 n.1; *United States v. O'Brien*, No. 1:25-mj-00014 (D.R.I. Apr. 2, 2025), ECF No. 3-1 (Ex. 10). The two affidavits are public filings.

[6] Statement by An Taoiseach Enda Kenny TD on the Recognition of Travellers as an Ethnic Group, Dáil Éireann (Mar. 1, 2017), https://www.gov.ie/en/department-of-the-taoiseach/speeches/statement-by-an-taoiseach-enda-kenny-td-on-the-recognition-of-travellers-as-an-ethnic-group-dáil-éireann/; Equal Status Act 2000 (Ir.), s. 2(1) (defining the "Traveller community" and making membership in it a protected ground); Race Relations (Northern Ireland) Order 1997, art. 5 (defining "racial group" to include "the Irish Traveller community"); Edmund Gilbert et al., *Genomic Insights into the Population Structure and History of the Irish Travellers*, 7 Sci. Rep. 42187 (2017) (genome-wide study estimating that the Traveller population).

value where, as here, there is no other evidence linking the participants . . . to drug-related activity." *United States v. $31,990 in U.S. Currency*, 982 F.2d 851, 856–57 (2d Cir. 1993) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). The Ninth Circuit, reviewing the search of a Romani family's home on an affidavit that relied on "a vague reference to 'Gypsies' generally," thought the point too plain for argument: "A warrant to search all 'Gypsies' found at a particular location would, of course, be invalid." *Marks v. Clarke*, 102 F.3d 1012, 1027–28 (9th Cir. 1996); *see also United States v. Weber*, 923 F.2d 1338, 1346 (9th Cir. 1990) (rejecting a warrant, and denying good-faith reliance on it, where the affidavit's profile of a class of offenders had no foundation tying the defendant to the class).

**C. The Later Warrants Add Nothing.**

The two later warrants fall with the first. The Federal Drive Warrant's probable cause is the September 19 Federal iCloud Warrant affidavit, "incorporated by reference as if fully stated herein"; it adds no fact about Mr. Connors, Ex. 3 ¶¶ 9–10; it stands and falls with the Federal Phone Warrant affidavit incorporates the September 19 affidavit, Ex. 2 ¶ 13, and its principal addition is a description of what agents had already found in the account under the tainted Federal iCloud Warrant—photographs and videos of construction work, contact entries for other tradesmen and for homeowners, and a video in which Mr. Connors tells a couple who had paid another contractor that he "was never on this job." *Id.* ¶ 16. That material is the product of the September 19 search and falls with it, *Wong Sun*, 371 U.S. at 484–88; *see United States v. Reilly*, 76 F.3d 1271, 1280–81 (2d Cir. 1996).

What else the Federal Phone Warrant affidavit adds is inadequate on its face, and its one new fact is false. The indictment, *id.* ¶ 12, referenced in the warrant establishes that a grand jury found probable cause that Mr. Connors committed the offense; it says nothing about whether

evidence of the offense is on his phone, and it cannot: "an indictment alone cannot supply probable cause to search." *United States v. Rubio*, 727 F.2d 786, 795 (9th Cir. 1983). The training-and-experience paragraphs assert that "individuals like Connors, who run a (purported) construction/home improvement business, utilize cellphones," *id.* ¶ 15—a proposition that would authorize the search of every contractor's phone in the county—and that people involved in fraud communicate electronically "particularly where such individuals have communicated with each other often (*see* September 19, 2025 Affidavit, ¶ 38)," *id.* ¶ 17—a cross-reference to the paragraph in which Mr. Connors does not appear.

That leaves the flier. The Federal Phone Warrant affidavit told the magistrate judge that Mr. Connors handed L.P. "a flier advertising Connors' purported home improvement business and listing a phone number to contact Connors." *Id.* ¶ 4(a). The flier did no such thing. It advertised "JH Contractors and Repairs"—Jimmy Hanrahan's initials—and the number on it was Mr. Hanrahan's: a prepaid line that Mr. Hanrahan had given the State Police as his own contact number, painted on the JH Contractors truck beside Mr. Hanrahan's own cell number. . The county had established all of this a year earlier, in applications the government had received and whose terms its own affidavits recite. Ex. 7 ¶¶ 26, 29; Ex. 4 ¶ 47; *see* Ex. 1 at 13 n.2; Ex. 3 ¶ 4. This false statement, the only statement in the entire affidavit purporting to link Mr. Connors to a phone involved in the event, is an independent ground to suppress the fruits of that search.

## III. THE GOOD-FAITH EXCEPTION DOES NOT SAVE THE FEDERAL WARRANTS.

Under *Leon*, evidence obtained under a warrant later held invalid may be admitted where the officers' reliance on the warrant was objectively reasonable. 468 U.S. at 922. The exception has limits, and two of them apply here. It does not apply where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except

for his reckless disregard of the truth," *id.* at 923, and it does not "protect searches by officers who fail to provide all potentially adverse information to the issuing judge," *Reilly*, 76 F.3d at 1280–81.

First, the government did not tell the magistrate judges what it knew about the county's searches. It had the county's extraction and returns and had reviewed them—beyond the period any county warrant covered. It knew what the county's warrant had been for: a licensing misdemeanor. Yet the one application that mentioned the county's phone warrant told the magistrate judge only that a county court "authorized a warrant to search the Connors Phone" and that the county had "loaded the Connors Phone Extraction on to the Subject Device." Ex. 2 ¶¶ 4–8. It did not disclose what the county's warrant had authorized; that the county had used the extraction to build a money-laundering investigation its warrant never named; when the extraction came into federal hands; how much of the county's material IRS-CI had reviewed; or what the basis was for the claim, made in a footnote to the incorporated September 19 affidavit, that the application relied on none of it. Ex. 1 at 13 n.2; *see* Point I.B, *supra*. An agency that obtains a federal warrant to search the product of a county search, without telling the magistrate what the county's warrant permitted or what the county and the agency itself did with the product, is not relying on the magistrate's judgment. It is withholding the facts that judgment required.

Second, the September 19 affidavit invited the magistrate judge to infer a fact the affiant knew to be untrue. The nexus for the Connors iCloud Account rests on paragraphs positing that "the Subjects" "are known to communicate with each other often, as shown above." Ex. 1 ¶ 39. The affiant wrote the analysis "shown above," and it shows no communication by Mr. Connors with anyone. *Id.* ¶ 38. "Reliance on a search warrant affidavit cannot be reasonable where that affidavit cites to factual circumstances that are not present." *Bertini*, 2023 WL 8258334, at *12.

Third, the Federal Phone Warrant affidavit told the magistrate judge that the number on the flier was "a phone number to contact Connors," Ex. 2 ¶ 4(a), when the county's own applications—which the government had received and the terms of which it recited in its own affidavits—had established that it was Mr. Hanrahan's, on a different phone. Ex. 7 ¶¶ 26, 29; Ex. 4 ¶ 47; *see* Ex. 1 at 13 n.2; Ex. 3 ¶ 4. By October 2025 the government knew more about that number than the county affiant had known in June 2024, and it described the flier to the magistrate judge in terms more misleading than the county's. A magistrate "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth" is the first case *Leon* itself excludes from the good-faith exception. 468 U.S. at 923.

## IV. THE COURT SHOULD HOLD AN EVIDENTIARY HEARING.

At minimum, this Court should order a hearing to determine facts crucial to assessing the validity of these warrants. Mr. Connors has put forth clear evidence demonstrating, at minimum, a very substantial likelihood that federal officials improperly relied on fruits of County's unconstitutional warrant in applying for the federal warrants and made false statements to the federal magistrate in the process. . Whether the government's warrants were nonetheless independent depends on what its agents did and knew before they applied, and the affiant's own "testimony as to what he would have done or how he would have behaved, while deserving of careful consideration as part of the analysis, is not necessarily conclusive." *Eng*, 971 F.2d at 861–62. These are contested issues of material fact going to the validity of the searches, *Pena*, 961 F.2d at 339, and they should be resolved at a hearing:

(1) What the government received from the county, and when—the phone extraction, the Apple returns, the county's applications and analyses, and any other product of the county's searches—and what it did with that material before it applied for each federal warrant.

(2) Who at IRS-CI reviewed the county's returns, when, and which accounts' returns "falling outside the Time Period" were reviewed; whether the affiant was among the reviewers; and what use was made of the review.

(3) The source, if any, independent of the county's searches, of the government's identification of the Connors iCloud Account by the number (631) 816-9911; of its decision to seek a warrant for that account; and of the "first known victim payment involving Connors" by which it fixed the period to be searched.

(4) The basis for the affidavit's statements that Mr. Connors "is a Traveler" and for its description of "the Travelers," and what investigation, if any, the affiant made of either, given that the description appears nearly verbatim in earlier affidavits of another agency in another district.

(5) The basis for the Federal Phone Warrant affidavit's statement that the flier listed "a phone number to contact Connors," given the county's records showing that the number was Mr. Hanrahan's contact number and not the number of the phone to be searched; and the basis for the statement in both federal affidavits that the Subjects "are known to communicate with each other often, as shown above," as applied to Mr. Connors.

## CONCLUSION

For these reasons, the evidence obtained under the Suffolk Phone Warrant, the Suffolk iCloud Warrant, the Federal iCloud Warrant, the Federal Drive Warrant, and the Federal Phone Warrant, and its fruits, should be suppressed, or, at a minimum, an evidentiary hearing should be held on the contested issues of fact identified in Section IV. Mr. Connors requests oral argument.

Dated: New York, NY
September 8, 2026

Respectfully submitted,

COVINGTON & BURLING LLP

By: */s/ Seema Sabu*
Seema Sabu
Amanda Kramer
30 Hudson Yards
New York, NY 10001
(212) 841-1000

TREANOR DEVLIN-BROWN PLLC

By: */s/ Arlo Devlin-Brown*

Arlo Devlin-Brown
230 Park Avenue, Suite 450
New York, NY 10169
(212) 858-9080

*Attorneys for Defendant Miles Connors*