**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ABBA COHEN, JASON CRYSTAL, and MILES CONNORS,<br><br>Defendants. | S1 25 Cr. 444 (GBD) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MILES CONNORS' MOTION TO SEVER**

TREANOR DEVLIN-BROWN PLLC
Arlo Devlin-Brown
230 Park Avenue, Suite 450
New York, NY 10169
(212) 858-9080

COVINGTON & BURLING LLP
Amanda Kramer
Seema Sabu
30 Hudson Yards
New York, NY 10001
(212) 841-1000

*Counsel for Defendant Miles Connors*

September 8, 2026

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... 1
**RELEVANT FACTS** .......... 2
**APPLICABLE LAW** .......... 6
**ARGUMENT** .......... 7
**CONCLUSION** .......... 10

## PRELIMINARY STATEMENT

Miles Connors asks to be tried separately from his co-defendants, Abba Cohen and Jason Crystal. He is a marginal figure in a sprawling case about other people: a money-laundering operation that, by the government's telling, took in more than $70 million in proceeds of home-improvement frauds committed against homeowners across the country. Ex. 1 ¶ 24.[1] The Indictment names Mr. Connors in one count, making only one real allegation: that homeowners he worked for were among the many who sent payments to Crystal's bank accounts. A joint trial would take weeks, and nearly all of it would be a trial of Cohen and Crystal; the narrow question that concerns Mr. Connors would be lost in it. Mr. Connors has been in jail for more than a year. He wants a trial, and a trial based on what the government actually alleges against him.

The Indictment is about an alleged money-laundering ring operated by others. According to the government, Cohen, a Diamond District jeweler, and Crystal, whom Cohen recruited when banks closed Cohen's accounts, took in, over more than two years, "more than approximately $20 million" of the proceeds of home-improvement frauds committed by many different people; kept a commission; returned the rest as cash, luxury watches, and wires; and, when their banks asked questions, answered with fabricated invoices. Indictment ¶¶ 1, 4–5. That operation is what Counts One through Six charge. Mr. Connors is in Count One only, on the allegation that Crystal received fraud proceeds "including from multiple victims who had been directed by MILES CONNORS, the defendant, and other Conmen to send checks or wire transfers to CRYSTAL's bank accounts." *Id.* ¶ 4. The Indictment does not allege that Mr. Connors received or moved a dollar of laundered money, spoke with Cohen or Crystal, or knew what became of a homeowner's payment after the homeowner made it.

---

[1] Exhibits cited as "Ex. __" are attached to the Declaration of Seema Sabu submitted with Mr. Connors' motion to suppress, which serves both motions.

Mr. Connors came into this case sideways. He is a home-improvement contractor from Suffolk County, and in 2024, the county was investigating him for contracting without a county license, a misdemeanor. Payments from homeowners on jobs he worked ended up in a bank account belonging to a Crystal company, and that discovery led to the far more expansive federal money-laundering investigation. The government built that investigation around Cohen and Crystal and left Mr. Connors attached to it at the margins.

A joint trial would try the alleged vast laundering operation, and Mr. Connors would sit through most of it. The jury would hear weeks of proof about dozens of victims in several states, tens of millions of dollars turned into cash and luxury watches, invoices fabricated for banks, and Crystal's own alleged admissions—none of it alleged to involve Mr. Connors—and would then be asked to decide the one narrow question on which his guilt turns: whether Mr. Connors joined an agreement with others knowing that the homeowners' payments were designed to conceal criminal proceeds. Mr. Connors has been detained since August 20, 2025; his co-defendants have been at liberty and have asked for more time; no trial date has been set. A separate trial of Count One as to Mr. Connors would be short and could be held soon. The Court should order it.

## RELEVANT FACTS

In June 2024, Suffolk County was investigating Mr. Connors and a man he sometimes worked for, James Hanrahan, for engaging in home-improvement business without a county license, an unclassified misdemeanor under Suffolk County Code § 563-17(A). On June 17, 2024, Hanrahan was arrested for stealing a wheelbarrow from a Lowe's. Mr. Connors was driving Hanrahan's truck at the time, and the officers found that he had an open warrant from Pennsylvania in an unrelated matter—an alleged theft of services at a water-park resort—and arrested him on it. Ex. 5 ¶ 12. Suffolk County later charged Mr. Connors with the licensing misdemeanor; that case remains pending. Ex. 2 ¶ 5.

The county's investigation eventually showed that funds from two homeowners for whom Mr. Connors allegedly worked ended up in the bank account of Infinity Installations, a company controlled by Crystal. Ex. 4 ¶¶ 84–101, 118. The county shared its work with federal agents, Ex. 1 at 13 n.2, and the matter became a federal money-laundering investigation: since about October 2024, IRS Criminal Investigation has been investigating Cohen, Crystal, and two other men suspected of laundering the proceeds of home-improvement frauds committed by many different contractors against homeowners across the country. *Id.* ¶¶ 20, 22, 24.

The operative Indictment, S1 25 Cr. 444, was returned on October 14, 2025 and unsealed on October 16, 2025. Dkt. Nos. 3, 4. Count One charges Cohen, Crystal, and Mr. Connors with conspiracy to commit money laundering, 18 U.S.C. § 1956(h), with the object of concealment laundering under § 1956(a)(1)(B)(i). Counts Two and Three charge Cohen and Crystal with substantive laundering. Counts Four through Six charge Cohen and Crystal with bank-fraud conspiracy and bank fraud for making "false statements to banks" and submitting "fake invoices to banks." Indictment ¶¶ 8–13. Mr. Connors is charged in Count One only.

The Indictment's narrative focuses on Cohen and Crystal. It accuses the men of receiving "fraud proceeds directly from victims" of an otherwise unidentified group of "Conmen" and "launder[ing] the proceeds on behalf of the Conmen into cash and other things of value, including luxury watches and wire transfers." Indictment ¶¶ 1, 4. When Cohen's accounts were closed "due to fraud," he "recruited" Crystal "to launder victim money through CRYSTAL's bank accounts in exchange for a commission"; Crystal bought "a luxury sports car for approximately $240,000"; and when banks asked about the money, both "created, or caused others to create, fake invoices." *Id.* ¶¶ 4–5. The one allegation specific to Mr. Connors is that, between March and September 2024, Crystal received proceeds "including from multiple victims who had been directed by MILES

CONNORS, the defendant, and other Conmen to send checks or wire transfers to CRYSTAL's bank accounts." *Id.* ¶ 4. The Indictment does not allege that Mr. Connors laundered any money himself, received funds back from the alleged launderers, communicated with Cohen or Crystal, or had any idea who they were. It is silent on how Mr. Connors joined the alleged conspiracy, or with whom he agreed to launder funds.

The government has not to our knowledge estimated the length of a joint trial, but the discovery is suggestive. The government has produced more than 100,000 files—some 226 gigabytes—including subpoena returns from dozens of banks and other institutions, the contents of the defendants' phones and cloud accounts, and material on dozens of alleged victims in at least three states. Its search-warrant affidavits, the fullest account it has given of its case, describe homeowners from Queens to Seattle, most of them elderly—among them a retired couple who paid some $5.5 million, part of it from their retirement accounts, and a 92-year-old Korean War veteran whose driveway was dug up and allegedly abandoned. Ex. 1 ¶¶ 25–32. They describe a laundering operation that moved $15 million through a single Crystal account in about four months, Ex. 4 ¶¶ 108–10, and that kept taking homeowners' money after a detective warned Cohen that it was fraud proceeds and a district attorney seized $1 million from his account, Ex. 1 ¶ 33. And there is Crystal's post-arrest statement. Interviewed by agents at JFK Airport at the time of his arrest, Crystal, according to the agents' report, admitted taking a commission on the checks he ran through his accounts, continuing after his bank flagged the money as fraud, making fake invoices, lying to his bank "out of greed," and "testing" homeowners' mental capacity. That statement is admissible against Crystal alone.

The evidence concerning Mr. Connors is small and separate. Of the ten alleged victims the government's principal affidavit describes, two identified Mr. Connors. Ex. 1 ¶¶ 29, 32. One paid

him directly, by check in his own name, in July 2020, nearly two years before the charged conspiracy began. *Id.* ¶ 32(a). The other was driven to the bank by Hanrahan and handed Hanrahan checks payable to a Crystal entity. *Id.* ¶ 29(b). The affidavit contains an analysis of calls among the subjects, but has no entry for Mr. Connors. *Id.* ¶ 38. The government has never described a bank record or transaction between Mr. Connors and Cohen or Crystal; the only contact between them it has ever described is a single day's communications in June 2024, in which a bank account number was sent to Mr. Connors and he is alleged to have passed it along. Ex. 4 ¶¶ 84–101. Against the "at least approximately $71 million" the government attributes to the operation, Ex. 1 ¶ 24, the homeowners linked by the government to Mr. Connors whose payments the government has traced to Crystal's accounts account for less than $500,000. *Id.* ¶ 29(b); Ex. 4 ¶¶ 84–101; Ex. 6 at USAO_APO_0000740–41.

Mr. Connors was arrested on August 20, 2025 and has been in custody since. Ex. 1 at 28 n.5. He was arraigned on November 5, 2025, and is currently held at the Essex County Correctional Facility in Newark. *See* Dkt. No. 19. Unlike Mr. Connors, his co-defendants are not detained: Cohen was released on bond the day he was arrested on October 16, 2025, and Crystal was released within days of his arrest. *See* Dkt. Nos. 14, 24. Mr. Connors was represented by prior appointed counsel, but little progress was made due to a conflict. Current counsel was appointed on March 18, 2026.

Mr. Connors is the father of six children, who live in Ireland. His mother died in England in or about October 2025, while he was in custody in this case; he could not see her before she died or attend her funeral. His father is severely ill with cancer in Ireland.

No trial date has been set. Under the current schedule, set on August 17, 2026, defense motions are due September 8, 2026, with a conference on November 19, 2026. On September 3,

2026, Crystal, joined by Cohen, asked to extend their own motion deadline by thirty days, to adjourn the November conference into December, and to exclude time through the adjourned date. Dkt. No. 56. Mr. Connors is filing on the existing schedule, with the government's agreement.

**APPLICABLE LAW**

If joinder "appears to prejudice a defendant," the Court "may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Severance is warranted where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). That risk arises where "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty"—a risk that "is heightened" when "many defendants are tried together in a complex case and they have markedly different degrees of culpability"—and where evidence "probative of a defendant's guilt but technically admissible only against a codefendant" is placed before the jury. *Id.* Courts in this District weigh the number of defendants and counts, the complexity of the indictment, the length of trial, "disparities in the degrees of involvement by defendants in the overall scheme," and "prejudice resulting from evidence admissible as to some defendants, but not others." *United States v. Santiago*, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001).

Rule 14 "leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts," *Zafiro*, 506 U.S. at 541; the decision is "committed to the sound discretion of the trial judge," *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989), and is "virtually unreviewable" on appeal, *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) (quoting *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988)). The question before the Court is the Rule's own—whether joinder "appears to prejudice" Mr. Connors—not whether a denial would survive appellate review. *See United States v. Nunez*,

No. 22 Cr. 293 (JPO), 2025 WL 547805, at *10 n.8 (S.D.N.Y. Feb. 19, 2025) (the court "retains discretion to grant a severance request, even if refusal to grant the request would not 'require a new trial'").

**ARGUMENT**

The factors that courts in this District consider all favor severance here. The Indictment charges three defendants in six counts, and five of the counts do not name Mr. Connors. The case is complex: it is built on the records of bank accounts he is not alleged to have used and the losses of homeowners he is not alleged to have met, and a joint trial would be long. The disparity in alleged involvement is about as wide as an indictment can draw. On one side are two men said to have run a laundering operation for more than two years, moved more than $20 million through it, and lied to their banks to keep it going; on the other is a contractor whose customers' payments went into one of their accounts over a few months. And the government's evidence includes Crystal's purported confession, which is admissible against Crystal alone.

Mr. Connors is, at most, a peripheral figure in the operation Count One charges. The Indictment's account of the laundering—the receipt of victims' money, the commission, the conversion to cash and watches and wires, the fabricated invoices—is an account of what Cohen and Crystal did. Indictment ¶¶ 4–5. Its one allegation about Mr. Connors is that homeowners he worked for were "directed" to pay Crystal's accounts. *Id.* ¶ 4. On the Indictment's own terms, then, his alleged conduct ended when the homeowners' money reached Crystal's accounts; everything that made the money "laundered" was done afterward, by others. The Indictment places Mr. Connors's alleged conduct in the final months of a conspiracy said to have run for more than two years. *Id.* ¶¶ 4, 6. The question a jury must answer about Mr. Connors—whether he knowingly joined an agreement to conduct transactions designed to conceal the proceeds of crime, *see United*

*States v. Huezo*, 546 F.3d 174, 179–80 (2d Cir. 2008)—is narrow, and the evidence that bears on it is a sliver of what a joint trial would present.

What the jury would hear at a joint trial is the trial of Cohen and Crystal: dozens of homeowners who never dealt with Mr. Connors; the bank-fraud counts, in which he is not charged; the sports car and the luxury watches; the detective who warned Cohen. And it would hear Crystal's alleged confession—the commission, the fake invoices, the lie to the bank "out of greed," the "testing" of elderly homeowners— all from the man whose accounts received the payments of Mr. Connors' customers. That statement is admissible against Crystal only. The Court would instruct the jury to put it out of mind in deciding what Mr. Connors knew, and the jury would then be asked to decide what Mr. Connors knew. This is what the Supreme Court meant by evidence "probative of a defendant's guilt but technically admissible only against a codefendant," and by the "heightened" risk that arises when defendants with "markedly different degrees of culpability" are tried together in a complex case. *Zafiro*, 506 U.S. at 539. Little of that proof would be admissible at a separate trial of Count One as to Mr. Connors, and none of it would be necessary: the government can prove that a laundering conspiracy existed without weeks of testimony from homeowners who never met him and alleged financial machinations he was not part of; the alleged confession could not come in at all; and Counts Four through Six would not be tried. A separate trial would be about his jobs, his customers, and what he knew about where their money went.

The Supreme Court described this danger eighty years ago in *Kotteakos v. United States*, 328 U.S. 750 (1946). There, many independent actors had each dealt separately with one man at the center—"separate spokes meeting at a common center," *id.* at 755—and the Court found the "dangers for transference of guilt from one to another" in a single trial of them all "so great that no one really can say prejudice to substantial right has not taken place." *Id.* at 774. "Guilt with us

remains individual and personal, even as respects conspiracies. It is not a matter of mass application." *Id.* at 772. *Zafiro* cites *Kotteakos* for exactly this point: that the risk of spillover is heightened when defendants of markedly different culpability are tried together in a complex case. 506 U.S. at 539. On the Indictment's own allegations, the laundering operation served many independent "Conmen" for more than two years, and Mr. Connors sits at the far end of one spoke.

A limiting instruction would be insufficient. "The sheer volume of such evidence against coconspirators, especially when the prejudiced defendants sit in court for weeks or months on end without their names so much as being mentioned, can so unbalance the scales that 'no amount of cautionary instructions could . . . undo [ ] the harm.'" *United States v. Gallo*, 668 F. Supp. 736, 750 (E.D.N.Y. 1987) (citation omitted) (quoting *United States v. Kelly*, 349 F.2d 720, 758 (2d Cir. 1965)). Courts in this district have granted severance on such a showing. In *United States v. Gilbert*, 504 F. Supp. 565 (S.D.N.Y. 1980), a defendant named in nine counts of a thirty-six-count securities-fraud indictment was severed from the scheme's architect. He had shown "disproportionate involvement in the overall scheme" that raised "a substantial risk that he would be prejudiced by the gradually accumulating effect of evidence of [the architect's] wrongdoing, at times long before [he] began to" take part; the risk of spillover to a defendant "charged in relatively few counts of a complex indictment" was "unacceptable." *Id.* at 571; *see also id.* at 571 n.6 (severing before trial because "the circumstances requiring severance appear with sufficient clarity at this preliminary stage"); *id.* at 572 n.7 (the spillover threat "would require severance in any event," apart from the defendant's asserted need for a co-defendant's testimony).

Where the government's case will be long, the Second Circuit has directed district courts to give "particular attention to the feasibility of conducting separate trials for any one or more defendants as to whom a separate trial would be relatively brief." *Casamento*, 887 F.2d at 1152. It

"makes little sense," the court continued, "to extend the time of a multi-month trial by including a peripheral defendant against whom a few days of evidence in a separate trial would be sufficient" to convict. *Id.*

The equities of delay point the same way. Mr. Connors has been in custody for more than a year, and he is the only defendant who is; his co-defendants have asked for more time; no trial date has been set. A separate trial of Count One as to him would be short—one count, one defendant, a handful of homeowners, no bank-fraud proof, no limiting instructions—and could be held soon. If the Court declines to sever, Mr. Connors asks in the alternative that it set a prompt trial date.

**CONCLUSION**

Mr. Connors respectfully requests that the Court sever his trial and order a separate trial of Count One as to him or, in the alternative, set and hold a firm trial date. Mr. Connors requests oral argument.

Dated: New York, NY
September 8, 2026

Respectfully submitted,

COVINGTON & BURLING LLP

By: <u>*/s/ Seema Sabu*</u>
Seema Sabu
Amanda Kramer
30 Hudson Yards
New York, NY 10001
(212) 841-1000

TREANOR DEVLIN-BROWN PLLC

By: <u>*/s/ Arlo Devlin-Brown*</u>
Arlo Devlin-Brown
230 Park Avenue, Suite 450
New York, NY 10169
(212) 858-9080

*Attorneys for Defendant Miles Connors*