# Exhibit 9

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR AN ARREST WARRANT**

I, Jodie L. Donaghy, Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for an arrest warrant for Elijah Gavin a/k/a Timothy O'Reilly a/k/a Elijah Thomas (YOB 1995) for violations of 18 U.S.C. § 1349 (wire fraud conspiracy), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1956 (money laundering). Based on the facts set forth in this affidavit, there is probable cause to believe that Gavin committed these violations of federal law between in or about March 2023 through in or about May 2024 in the District of Rhode Island and elsewhere.

2. I am a Special Agent with the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI") and am authorized to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, and 19 of the United States Code and to execute warrants issued under the authority of the United States. I have been employed by HSI since February 2007. I am currently assigned to conduct investigations in the Resident Agent in Charge ("RAC") Providence Office of HSI. I have prepared numerous affidavits in support of applications for federal search and arrest warrants.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

**Background of the Investigation**

4. Gavin and others known and unknown (collectively "the Targets"), defrauded property owners in New Jersey, New York, Massachusetts, and Rhode Island by fraudulently inducing them to hire the Targets to conduct building repairs that were not needed and were not performed. The Targets' scheme, which is becoming increasingly common throughout the United States, has come to be known as Traveling Conmen Fraud Group.[1] As part of the scheme, Gavin and those working with him misrepresented who they were, the qualifications of their construction businesses that they supposedly operated, the need for the services offered, and the work performed. In total, the Targets defrauded property owners of over $900,000 between March 2023 and May 2024.

5. One of the Targets' victims was LC, a 78-year-old, Rhode Island woman, whom they fraudulently induced to pay over $850,000 for unnecessary foundation and basement repairs to her residence. The Targets made misrepresentations to LC about the condition of her foundation, basement, and roof and misrepresented the validity of their business to convince LC

[1] I am aware that The Traveling Conmen Fraud Group or Travelers has been recognized by the Federal Bureau of Investigation's ("FBI") Terrorist Screening Center as a Transnational Organized Crime (TCO) group. While not a centrally organized group, the Travelers are groups of Irish or U.K. nationals who enter the United States on pleasure or tourist visas and overstay their visits or, more commonly, enter the United States illegally. Once in the United States, Travelers go to different cities and states, soliciting construction work. This is sometimes done door-to-door, by knocking and introducing themselves to homeowners, usually elderly individuals, claiming to have extra materials left over from a prior job or noticing a defect or damage to the home that needs to be repaired immediately. The members often quote a low price, and then, after further inspection, demand much more money. In addition to door-to-door "marketing," some members go to the lengths of creating a website and social media postings or even using mass mailers through the U.S. Post Office. Travelers usually start with a small job (such as fixing brick entry steps or re-pointing chimneys) and then convince homeowners that their homes need major repairs, such as foundation work or waterproofing. At this point, the Travelers overcharge homeowners and sometimes intimidate homeowners into paying them up front for work that is not completed. Travelers often hire day laborers to conduct most of the physical work on a jobsite. Travelers do not have work authorization documents, and their businesses are usually not registered with the state where they claim to have a business. Traveler groups do not pull local permits for their work and do low quality, unnecessary, or incomplete mason/roofing work, sometimes damaging homeowners' residences.

to hire them. They induced LC to make checks payable to Gavin and others. Gavin deposited the checks made payable to him into his TD Bank account and spent the money personally. Gavin or "Kelly" transferred the other checks to suspected money launderers in New York and California.

6. Based on a review of checks deposited into Gavin's bank accounts, investigators identified five additional victims of Gavin's fraud scheme. These five victims suffered a combined loss of approximately $90,000 from in or about March 2023 to in or about May of 2024.

**Gavin's immigration status and false ESTA application**

7. Elijah Gavin entered the United States on October 4, 2022, from Dublin, Ireland after being automatically approved for the Visa Waiver Program (VWP)[2] facilitated by an Electronic System for Travel Authorization (ESTA)[3] application. The ESTA application requires applicants to attest that all information filled out by the applicant or by a third party on behalf of an applicant is true and correct to the best of the applicant's knowledge.[4]

8. Based on an online look-up of the Internet Protocol ("IP") address associated with the filing of Gavin's ESTA application, I believe that the application was submitted by a third-party in the United States while Gavin was in the U.K. When a third-party submits an ESTA application on another's behalf, he or she attests that they have read the application to the

---

[2] The Visa Waiver Program (VWP) is administered by DHS and enables eligible citizens or nationals of designated countries to travel to the United States for tourism or business for stays of 90 days or less without first obtaining a visa. The VWP does not allow visiting individuals to work in the United States.

[3] ESTA is an automated system that determines the eligibility of visitors to travel to the United States under the VWP. Authorization via ESTA does not determine whether a traveler is admissible to the United States. U.S. Customs and Border Protection officers determine admissibility upon travelers' arrival. The ESTA application collects biographic information and answers to VWP eligibility questions.

[4] 18 U.S.C. § 1546 criminalizes falsely making, or using, a document for entry into the United States.

Case 1:25-mj-00444-GBD Document 62-9 Filed 01/30/26 Page 5 of 27

applicant, or that the applicant has read the application, and certifies that the answers are true and correct.

9. Gavin's ESTA application included false responses to questions related to his criminal history. Specifically, it listed "No" to Question 2, "Have you ever been arrested or convicted of a crime that resulted in serious damage to property, or serious harm to another person or government authority" and "No" to Question 3, "Have you ever violated any law related to possessing, using or distributing illegal drugs."

10. I know based on a Northern Ireland Unlawfully at Large ("UAL") Notice, https://www.justice-ni.gov.uk/unlawfully-at-large/elijah-martin-gavin, that Gavin possesses convictions in Northern Ireland for grievous bodily harm, burglary and theft, burglary with intent to steal, and possession of a class B substance. On May 26, 2023, DHS retroactively denied Gavin's ESTA application because of his affiliations with The Traveling Conmen Fraud Group.[5]

**Gavin and others defraud LC**

11. On or about February 27, 2024, investigators with the Rhode Island State Police ("RISP") interviewed LC, a 78-year-old widow, who reported having lost $669,500[6] in an alleged contractor scam. Since the initial interview, LC provided additional information to investigators.

12. According to LC, on or about November 17, 2023, while at her residence she was approached by an individual who identified himself as "Simon Kelly." "Kelly" offered LC an

[5] Gavin has since resided in the United States for 681 days after his October 4, 2022, entry, as of August 15, 2024. That is 591 days longer than the 90 days allowed for under the VWP. Gavin has also conducted work, though fraudulent, in the United States, disallowed under the VWP guidelines set by DHS.

[6] Subsequent investigation as described in paragraph 35 revealed that this number is much greater than initially reported. Investigators obtained bank records which demonstrate that LC provided checks totaling $1,304,500 to "Kelly" and Gavin resulting in $854,500 in loss to LC. A $450,000 check provided by LC to "Kelly" and Gavin was denied for insufficient funds.

informational postcard regarding his supposed construction business, Legacy Roofing & Masonry, located at 198 Tremont Street, Boston, MA. The card represented that the business was fully licensed and insured.

13. LC provided a copy of this card to law enforcement. Subsequent investigation revealed that 198 Tremont Street is associated with a UPS Store. Also, there is no business named Legacy Roofing & Masonry that was or is registered with either the Massachusetts or Rhode Island Secretary of State. Furthermore, the Massachusetts Office of Consumer Affairs and Business Regulation and the Rhode Island Department of Business Regulation do not have any record of a Legacy Roofing & Masonry being licensed or registered in their respective states.

14. According to LC, "Kelly" told her that her home's foundation needed repair. LC advised "Kelly" that she had an appointment and was not interested. When he persisted, she further advised "Kelly" that her husband had recently passed away, and that she had an appointment with her attorney. After hearing this information, "Kelly" made a sympathetic statement to LC, "Kelly" asked if he could come back, and LC replied "Ok" she would talk to him tomorrow.

15. In subsequent communications, LC agreed to provide "Kelly" with a $9,500 deposit to make repairs to her foundation and the brick-and-mortar walls that divided certain spaces and rooms in her basement. During this time, LC recalled that an additional "supervisor" showed up to her residence and identified himself as "Timothy O'Reilly" (subsequently identified as Elijah Gavin).

16. LC informed investigators that "Tim" was present at LC's residence when she provided checks as payment. LC also observed "Tim" use his cell phone to photograph checks provided by LC.

Case 1:25-cr-00044-GBD Document 62-9 Filed 09/08/26 Page 7 of 27

17. At some point, "Kelly" provided LC with telephone number (781) 809-5887 ("Target Phone 1"). She used this telephone number to communicate with "Kelly," via both telephone call and text message.

18. On or about November 21, 2023, LC made her first payment. She paid "Kelly" $9,500 via Citizens Bank check (#1058). The check was made payable to "Elijah Gavin mgr + director." The memo line read "deposit." When investigators asked LC about the name "Elijah Gavin," LC stated that "O'Reilly" and "Kelly" directed her to make the check payable to Gavin.

19. LC reported that a work crew consisting of four unknown males responded to the residence and began work in the basement. LC advised that the work crew began to remove the white plaster facia that coated the interior of the home's stone and brick foundation and replace it with a cement-based facia.

20. After some time, "Kelly" solicited a second payment from LC for labor and materials in the amount of $35,000. LC provided Citizens Bank check (# 1059). This check was also made payable to "Elijah Gavin." The memo line read "Absolute Construction." LC stated that "O'Reilly" and "Kelly" told her that Gavin was the boss and Absolute Construction was the company name.[7]

21. As work in the basement progressed, "Kelly" advised LC that the east side of the foundation was in need of major repair, and its structural integrity was compromised. "Kelly" represented to LC that an inspector would not allow a house with foundation bricks in its current condition to be sold. "Kelly" stated that he had a building inspector come to her house,

[7] According to the Secretary of the Commonwealth of Massachusetts website, Absolute Construction Contractors Corp is a corporation organized in Massachusetts with Elijah Gavin listed as President and Treasurer and Anton Mironenko listed as Secretary, Director, and Registered Agent. The address for the corporation is 201 Washington Street, 26th Fl, Boston, MA. Absolute Construction Contractors Corp is registered with the Massachusetts Office of Consumer Affairs and Business Regulation under the name Anton Mironenko.

and that the inspector determined that her foundation wall was not strong enough to tolerate the injection of mortar into the cracks. Based on this, "Kelly" said that they needed to insert poles into the ground outside of the house and that this work would require equipment from New York. LC said she asked "Kelly" for the inspector's report, but it was never provided. She said that although she didn't feel like the house was going to collapse, she knew the condition of the foundation bricks weren't good and "Kelly's" statements reinforced a vague idea that if she were to sell the house, a potential buyer may not want to tackle a problem described by "Kelly."

22. Due to the "Kelly's" representation of the foundation condition to LC, "Kelly" wanted to hire a third-party contractor from New York who had the specialized heavy equipment needed to dig and install support posts around LC's foundation. He informed LC that the equipment-transportation and operating costs were extremely expensive. Therefore, "Kelly" said that LC would have to pay an up-front deposit covering the cost of the insurance for this equipment prior to its release. "Kelly" requested a security deposit of $450,000 for this equipment from LC. LC was told that she would receive the $450,000 back.

23. On or about December 7, 2023, LC paid "Kelly" a Bank of America check (#195) in the amount of $450,000 made payable to ADDS Master, Inc. Due to insufficient funds, this check was later returned as not payable. As a result, "Kelly" requested an alternative form of payment. LC stated that she simply thought she had more money in the Bank of America account at the time she wrote out the check.

24. "Kelly" also requested $175,000 for additional materials and labor. On December 7, 2023, LC wrote a Bank of America check (#196) in the amount of $175,000 made payable to Unikeen STP. LC didn't recall what exactly this check was for, but she thought that two (2) machines were arriving, one to dig the hole and one for the cement.

Case 1:25-mj-00444-DB Document 6 Filed 09/08/25 Page 9 of 27

25. On or about December 15, 2023, in light of the earlier check that was declined for insufficient funds, LC wrote a Bank of America check (#197) in the amount of $350,000 made payable to ADDS Master, Inc., and a Citizens Bank check (#1060) in the amount of $100,000 made payable to ADDS Master, Inc.

26. The "machine from New York" that LC paid for did not show up. Each time LC confronted "Kelly" about the whereabouts of the "magic truck," "Kelly" made excuses.

27. At some point, "Kelly" requested an additional $25,000.00 to fix her roof. He arrived at her residence with two men who were introduced to her as roofers. "Kelly" pointed out cracks in the ceiling and stated it was due to the roof leaking. LC stated that the cracks were from when the roof was replaced approximately 11-12 years ago. LC advised "Kelly" that she was out of money and was left with only her retirement funds.

28. "Kelly" instructed LC on how to conduct a wire transfer from her Bank of America account. On January 8, 2024, "Kelly" sent LC a text message with wire instructions from (781) 809-5887 ("Target Phone 1"). The message read, "WIRE INFO ES CAPITAL 23 W 47street ste 20 New York, NY 10036," a routing number and account number were listed and the bank was identified as Metropolitan Commercial Bank. On or about January 8, 2024, LC arranged for this wire transfer to be sent from her Bank of America account to the account provided by "Kelly." The following morning, LC was contacted by a Bank of America representative who inquired about the reason for the transfer. According to LC, Bank of America personnel informed her that the company was not in the construction business, but instead dealt with Bitcoin or cryptocurrencies. Thus, LC requested that Bank of America cancel the wire transfer, and no further funds were paid to "Kelly."

29. LC advised that after she cancelled the wire transfer, "Kelly" responded to LC's residence along with another man by the name of "Lewis." Although she could not remember Lewis' last name, she remembered that it began with an "R" and later thought it was "Roth." She described this subject as "short, wiry, slightly hunched over, having a square face, very blue eyes, dark hair, and facial hair, and bushy eyebrows, also speaking with an Irish accent."

30. LC advised that the three men pressured her to continue to make payments for the remaining "work" to her property. She contacted her neighbor, CD, who responded to her residence and observed the work done to the basement. LC stated upon CD's arrival, the three men fled the residence, and she has not seen them since. LC advised the date of this incident was likely on or about Monday, January 11, 2024.

31. LC did not have contact with the Targets again until on or about April 18, 2024. On or about that day, at approximately 12:50 p.m., LC contacted a detective with the RISP and left a voice message. LC stated that she had received a call from someone who claimed to be an owner of one of the "companies" that had performed the work at her residence. This person provided the name of "Ian Walsh" and phone number (617) 312-3984 ("Target Phone 3"). He offered to write her a refund check on account of the shoddy work being done to her residence and further advised that two people who previously worked for him had now been fired because they did not do proper work. He asked how she would like to receive her check, either by mail or delivered in person. He said that he would have one of his guys deliver the check.

32. On the same day at approximately 1:03 p.m., LC called the detective again and left a second voicemail. During this call, her home phone can be heard ringing in the background. LC paused and read off the phone number as it appeared on her telephone as "617-312-3984," the same number mentioned above. LC then picked up the house phone while

Case 1:25-cr-00444-GBD Document 62-9 Filed 12/08/26 Page 10 of 26

simultaneously leaving a voice message on the detective's desk line from her cellular telephone. LC had a conversation with the unknown male individual on speakerphone.

33. During this conversation, LC and the caller can be heard talking about the shoddy work in the basement. The caller stated that LC was owed a refund of $850,000. He further stated they had a check in their office for $950,000. LC and the caller continued to discuss how much she was owed and the work that was done. Then the recording cut off.

34. The detective contacted LC and had follow up discussion regarding these voicemails. She advised that the subject, "Ian Walsh," stated that he wished to issue her a refund check of $850,000, but an error had been made and the check was made out in the amount of $950,000. Walsh requested that LC accept the "refund check" of $950,000, but that she issue him a check in the amount of $100,000 in return. The detective advised LC to cease any communications with these individuals and to report any further contact from them to the RISP.

35. In reviewing the bank records obtained as part of this investigation, investigators identified two additional checks that were written by LC and deposited into the Unikeen STP account, Check #167 made payable to Unikeen STP in the amount of $50,000, and Check #170 made payable to Unikeen STP in the amount of $135,000. Both checks were dated November 29, 2023. In light of these two additional checks, LC's total loss appears to have been $854,500, which is consistent with "Ian Walsh's" representations to her in April 2024.[8]

[8] On January 10, 2025, investigators interviewed LC with respect to these two checks. She did not recall the checks or writing them, but she identified them as her checks and she recognized her handwriting on the checks. When asked why she had not provided the checks to investigators previously, she explained that prior to her first meeting with law enforcement, she had asked the bank to print copies of checks for her that she identified by number. She could not remember why she had not obtained copies of these two checks as well. She then said that she would be a terrible witness if she was needed because she could not remember.

**Inspection of LC's residence**

36. On December 11, 2024, a home inspector hired by the government responded to LC's residence to conduct a property inspection. In assessing, LC's foundation, he noted there was an area missing bricks and he recommended repair/repointing. He further noted that there was no evidence of work being done to the exterior of the foundation. With respect to the roof, the inspector noted cracked plaster at the upper-level hallway and rooms but observed the property's overall slate roof condition to be serviceable. The inspector also noted that the interior basement foundation walls had been recently parge coated. The inspector observed moisture intrusion at several locations in the interior basement walls and observed active water penetration through the parging materials.

**Identification of "Timothy O'Reilly" as Elijah Gavin**

37. On or about May 6, 2024, a RISP detective responded to LC's residence with investigative materials that had been accumulated regarding Gavin and The Traveling Conmen Fraud Group through open-source searches as well as information sharing from other law enforcement. Specifically, a news article, (newsletter.co.uk News Article[9]) that shared the likeness of Elijah Gavin, and a law enforcement information product containing images of various possible "Irish Traveler" conmen.

38. LC was presented with the open-source news article depicting Gavin ("newsletter.co.uk News Article"). She was not advised that the person in the photo was in fact Gavin, or of the context of the news article. LC immediately recognized the person depicted in

[9] In the newsletter.co.uk news article published on April 28, 2022, Elijah Gavin, described as a conman, is reported as having vanished after being let out of jail on compassionate leave.

this article, sat up, pointed at the laptop screen, and stated, “That’s Tim!” The below image is the photograph of Gavin depicted in the newsletter.co.uk news article that LC identified.



39. She was additionally provided with Gavin’s State of New York Department of Motor Vehicles operator’s license image. She further stated, “Yes, that’s Tim.” LC was asked to what degree of certainty she could state that this was in fact the person who identified himself as “Timothy O’Reilly.” She stated that she was fully confident and clearly recognized this person, who in fact is Elijah Gavin as the person she knew as “Timothy O’Reilly.” See below image of Gavin’s State of New York Department of Motor Vehicle operator’s license image.



**<u>Analysis of Financial Records Associated with LC's Payments</u>**

40. Based on investigators' review of subpoenaed financial records, investigators learned that LC's Bank of America Check #195[10] in the amount of $450,000 made payable to ADDS Master, Inc, and Bank of America Check #197 in the amount of $350,000 made payable to ADDS Master, Inc. were cashed or attempted to be cashed through Cash4Less, Inc., a check cashing service located in Los Angeles, California. LC's Citizens Bank check #1060 in the amount of $100,000 made payable to ADDS Master, Inc. was also negotiated at Cash4Less. All three checks were cashed or attempted to be cashed by E[redacted] A[redacted] B[redacted], and the disposition of those funds after their conversion into cash is unknown. In my training and experience, and the experience of other investigators working on this case, money launderers

[10] As previously stated, this check was returned for insufficient funds and LC then wrote two other checks for a total amount of $450,000 from two bank accounts.

will convert fraudulent proceeds into cash to conceal the nature, source, location, ownership or control over the funds.

41. Bank of America records also revealed that LC's Bank of America Checks #167, #170, and #196 made payable to Unikeen STP in the amounts of $50,000, $135,000, and $175,000 respectively, were deposited into a Bank of America account held in the name of Unikeen STP. This is an account controlled by E[redacted] Y[redacted]. Once deposited, these funds were commingled with other funds. In my training and experience, and the experience of other investigators working on this case, money launders will commingle funds in order to conceal the nature, source, location, ownership, or control over criminal proceeds. The Unikeen STP account had large deposits into the account in both November 2023, over $3 million deposited, and December 2023, over $2 million deposited. During those same months, there were withdrawals in the form of wire transfers, online transfers to other Bank of America accounts, Zelle payments, small household purchases, and other miscellaneous payments to credit cards held in Yurowitz's name from the account. Withdrawals from the account each of those months were in excess of $2 million.

42. Investigators learned that LC's check #1058 made payable to "Elijah Gavin mgr + director" in the amount of $9,500 and drawn on LC's Citizens Bank account was deposited into a TD Bank account, Acct. # xxxx-xx-4688 held in the name of Elijah M. Gavin (YOB 1995). The records also indicated that check #1059 made payable to "Elijah Gavin" and drawn on LC's Citizens Bank account in the amount of $35,000 was also deposited into Gavin's Acct. #4688. The address on Gavin's account was 3000 Presidents Way, Apartment 3303, Dedham, MA with a listed phone number (508) 369-6997 and an email of gavinelijah123@gmail.com. Acct. #4688 was opened with Elijah Gavin's United Kingdom

Passport #554736981. The date of birth listed on the account opening documents, Gavin's UK passport, and Gavin's NY driver's license are the same.

43. TD Bank provided video surveillance footage of Gavin conducting ATM transactions. This surveillance indicated that on November 21, 2023, at approximately 2:51 p.m., Gavin responded to a TD Bank ATM located at 180 Westminster Street, Providence, Rhode Island and deposited a check after inserting his TD Bank debit card. This surveillance is consistent with a TD Bank statement belonging to Gavin's TD Bank Acct. #4688, which indicated that on November 21, 2023, a check was deposited in the amount of $9,500 at TD Bank located at 180 Westminster Street, Providence, Rhode Island. Statement records indicated that this was check #1058 issued by LC to Gavin. The following two screen captures are from video surveillance footage from TD Bank when Gavin entered the TD Bank in Providence, RI on November 21, 2023.






The following screen capture is from video surveillance footage from TD Bank when Gavin conducted the ATM transaction at the TD Bank in Providence, RI on November 21, 2023.




44. Likewise, TD Bank surveillance and statement records indicated that on November 27, 2023, at approximately 12:43 p.m., Gavin responded to TD Bank located at 180 Westminster Street, Providence, Rhode Island, and deposited check #1059 issued by LC to Gavin in the amount of $35,000 into his Acct. #4688. The following two screen captures are

from video surveillance footage from TD Bank when Gavin entered the TD Bank in Providence, RI on November 27, 2023.







The following screen capture is from video surveillance footage from TD Bank when Gavin conducted the ATM transaction at the TD Bank in Providence, RI on November 27, 2023.




45. In total, Gavin deposited $44,500 of LC's funds into his TD Bank Acct. #4688 between November 21, 2023, and November 27, 2023. The day before Gavin's first deposit of a check from LC his account had a negative balance of $43.68. Between November 21, 2023, and December 19, 2023, the only other deposits or credits to the account aside from LC's funds were a $600 cash deposit, and two credits in the amount of $24.99 and $35.

46. After depositing LC's checks into his account, over the next two weeks Gavin[11] conducted[12] five large cash withdrawals from Acct. #4688 as follows:

| Date | Amount | Branch Location |
|---|---|---|
| 11/29/23 | $9,000 | East Providence, RI |
| 12/7/23 | $10,000 | Providence, RI |
| 12/7/23 | $10,000 | East Providence, RI |
| 12/8/23 | $4,000 | Hollis, NY |
| 12/8/23 | $9,000 | Flushing, NY |

[11] According to records provided by TD Bank, an individual using Gavin's debit card conducted the withdrawal on November 29, 2023. Currency Transaction Reports ("CTR") provided by TD Bank list Gavin as the individual conducting the remaining four withdrawals that occurred on December 7 and December 8, 2023.

[12] Based on my training and experience, I know that financial institutions are required to file a CTR for cash transactions in excess of $10,000. In my experience, I know that breaking up cash withdrawals for the purpose of evading the Bank Secrecy Act reporting and recordkeeping requirements is a violation of 31 U.S.C. § 5324. I also know that conducting financial transactions with the proceeds of wire fraud, knowing that such proceeds are the proceeds of unlawful activity, and knowing that the transaction is designed to avoid reporting requirements constitutes money laundering in violation of 18 U.S.C. § 1956(a)(1)(B).

47. In addition to the large cash withdrawals described above, between November 24, 2023, and December 18, 2023, Gavin, or someone using his debit card, also conducted 35 Point of Sale (POS) transactions from Acct. #4688 for housing, hotels, food, clothing, gas, liquor store, groceries, and other miscellaneous living expenses.

**Elijah Gavin is believed to have used the "Simon Kelly" phone number (Target Telephone 1) and the "Ian Walsh" phone number (Target Telephone 3)**

48. The cellphone number provided to LC by the individual purporting to be Simon "Kelly" (hereinafter "the Kelly number") is believed to have been a phone number used by Gavin. As previously described, LC provided law enforcement with screenshots of messages between her and the Kelly number. In these messages, on January 8, 2024, the Kelly number messaged, "It's Simon call me please as urgent." The Kelly number then messaged LC wiring instructions with bank information for the wire. LC responded with a screenshot showing confirmation of a scheduled ACH payment in the amount of $25,000.

49. Although the individual purporting to be "Kelly" provided LC with this cellphone number, further investigation shows that the Kelly number was likely a number used by Gavin. First, on March 7, 2024, Gavin was stopped by police on the Palisades Interstate Parkway in an Ace Contractors Corp truck bearing cell phone number (201) 681-0895 ("Target Phone 2"). Police body camera footage of that traffic stop and the subsequent consensual search of the vehicle driven by Gavin revealed that he had in his possession three cellphones, a TD Bank debit card associated with Acct. #4688, and what appeared to be a card for carrying a SIM card, among other items. Written on this card was the Kelly number, although part of the "7" appears to have been worn off as depicted below:




50. Additionally, investigators know that LC reported speaking with "Kelly" on the Kelly number several times during the relevant time period. T-Mobile records show that between December 12, 2023, and January 11, 2024 there were a number of calls and text messages between LC and the Kelly number. Every time the Kelly number was used between December 12, 2023 and January 11, 2024 it was associated with a Samsung Galaxy S10 assigned IMEI 352335101200200.[13] This same device was associated with cell phone numbers provided by Gavin to other victims (see paragraphs 56 - 58 below) and a cellphone number listed on a contract provided by Gavin to one of those victims (see paragraph 57 below). Based on my training and experience, I know that individuals involved in criminal activity often use multiple different cell phone numbers and cell phones, and that it is possible to switch out SIM cards thereby associating different cellphone numbers with the same device.

[13] An IMEI or International Mobile Equipment Identity is a number assigned to a particular device. The last number in the IMEI is referred to as the check digit number, which is used to verify the accuracy of the IMEI sequence. Often times in records produced to law enforcement in response to subpoenas, the check digit number is either not listed or is listed as a "0." With respect to IMEI 352335101200200, the T-Mobile records provided do not include the check digit number, which is a "6" and instead replace the "6" with a "0" as in the IMEI assigned to the Samsung Galaxy S10 referenced in paragraph 50.

This practice can make it more difficult for law enforcement to track an individual's movements and activities.

51. Investigators obtained historical cell site location information or CSLI for the Kelly number. The CSLI data was analyzed by a member of the Federal Bureau of Investigation ("FBI") Cellular Analysis and Survey Team ("CAST"). The FBI CAST agent compared the CSLI for the Kelly number to locations where Gavin was believed to be located at particular times based on other records obtained during the investigation. For example, records obtained from four hotels in the Rhode Island area placed Gavin at those hotels on various dates, specifically on or about September 13, 2023 (Fairfield Inn in Warwick), September 14, 2023 (Courtyard by Marriott in Warwick), September 20, 2023 (Hampton Inn in Pawtucket), and October 17 - 18, 2023 (Holiday Inn Express & Suites in Woonsocket). Additionally, based on records obtained from TD Bank, Gavin was placed at a TD Bank ATM located at 180 Westminster, Providence, RI on November 21 and November 27, 2023. The CAST agent compared the CSLI for the Kelly number with the locations of the hotels and ATM referenced above and concluded that the Kelly number was using cellphone towers in the area of those hotels and ATM near the time Gavin was at those locations.

52. Also, based on records obtained from Google, investigators learned that the Kelly number is associated with an email address, elijahgavin716@gmail.com. Additionally, investigators learned that two phone numbers called Google Voice number (401) 358-1213 associated with gavinelijah48@gmail.com on December 7, 2023, and February 26, 2024, respectively. Google records indicate Google Voice connected both callers to the Kelly number. Google Voice records show both callers left voicemails.

53. Likewise, Gavin is believed to have used the cellphone number of the individual purporting to be "Ian Walsh" (hereinafter "the Walsh number"). "Walsh" called LC on or about April 18, 2024, in a failed attempt to convince her to provide him with an additional $100,000 in exchange for a $950,000 "refund" check. Based on records provided by Tracfone, the Walsh number was used on two different devices on April 18, 2024. T-Mobile records show that one of the devices associated with the Walsh number was also associated with the Ace Contractors Corp number ("Target Phone 2"), which was the number on the truck Gavin was driving at the time of his traffic stop on the Palisades Interstate Parkway. The second device associated with the Walsh number was also associated with the Ace Contractors Corp number and another number provided to one of the other victims (see paragraph 59-60 below).

54. According to the FBI CAST agent, when the Walsh number called LC on April 18, 2024, the user of the Walsh number was located in Massachusetts.

**Five other victims defrauded by Gavin and identified by a review of checks deposited into Gavin's TD Bank account**

55. Investigators interviewed a second victim, HB, who reported that between on or about March 4 and March 6, 2023, she was approached by an individual at her property in Roslindale, MA. This individual offered to repair HB's brick steps for $600. The work began and continued for approximately ten days. HB described the individual as white with a strong accent, possibly Irish or Brogue, of average build and height, with no facial hair and possibly red hair. HB wrote five checks totaling approximately $19,200. One check was made payable to "Approved Roofing" and the other four checks were made payable to "Elijah Gavin." A second individual, "Richard" or "William," was sometimes present during the work. HB canceled one of the $5,000 checks due to concerns about the quality of the work, which she now considers hazardous. According to HB, the physical work was done by two Spanish-speaking workers.

56. Investigators interviewed a third victim, JO, who reported that in or around early May 2023, JO contacted a company called "Ground Force Masonry" through Angie's List to skim coat the wall in front of his house. "Thomas" offered to do the job for $1,900. The work began on or about May 8, 2023, and involved two laborers described as Dominican. JO paid $3,300 via checks made payable to "Elijah Gavin," who was identified as "Thomas." When JO asked "Thomas" why he wanted the checks made out to Gavin, "Thomas" replied that Gavin is his accountant who helps facilitate transferring money as he ("Thomas") is not a U.S. citizen. "Thomas" initially proclaimed he was from Australia, despite being challenged by JO who is of Irish ancestry. JO characterized the work done as poor quality and workers had to redo the wall at least once after JO complained. JO reported that he will have to redo both the wall and stairs and that they are "worse off" now than before. JO identified Gavin as "Thomas" in a photo lineup to law enforcement officers.

Case 1:25-cr-00444-GBD Document 6-9 Filed 09/08/25 Page 24 of 26

57. Investigators interviewed a fourth victim, RC, a pastor of a church in Bronx, NY. RC reported that in August 2023, the church needed an exterior wall repaired due to filtration issues. After soliciting for contractors online, she was contacted by an "Elijah Thomas" from "City Wide" for the job. RC described "Elijah Thomas" as a white male, with blue eyes, blonde hair, and an Irish accent. "Elijah Thomas" initially claimed to be Australian. After RC challenged him that his accent was Irish rather than Australian, "Elijah Thomas" provided RC an Ireland driver's license with the name "Elijah Gavin." RC initially agreed to a $40,000 contract and paid a $14,000 deposit on or about August 1, 2023, made out to Elijah Gavin. "Elijah Thomas" later requested additional payments, bringing the total to approximately $61,000, all in checks made out to "Elijah Gavin." According to RC, despite assurances, no permits or licenses were presented. The work was poorly done and required further repairs by another contractor, costing RC another $74,000. To raise money, RC stated that the church conducted an offering/collection specifically to make up the funds spent on the work. Investigators showed RC a photo line-up of Elijah Gavin and his brother, Jonathan Gavin. RC identified Gavin as "Elijah Thomas."

58. Investigators interviewed a fifth victim, DP, who reported that in or around late May 2023, DP visited a home service listing website to find a company to replace a concrete pad at DP's residence. DP reported that a company by the name of "Ground Force Masonry" contacted DP and stated they could do the work faster and cheaper than other potential vendors. DP stated that the company claimed to be fully licensed and insured, but DP did not know if the company had pulled any permits for the work. DP paid approximately $13,500 to an individual identified by DP as Elijah Gavin. DP characterized the individual as approximately 5 feet 7 inches, "red-ish" hair, clean shaven, blue eyes, and having an Irish accent. DP stated that Gavin

Case 1:25-cr-00344-GBD Document 6 Filed 08/28/25 Page 25 of 26

asked DP for cash payment, to which DP provided approximately $2,500 in cash to Gavin before refusing to provide additional cash. DP made subsequent payments made out to Elijah Gavin via check. DP described the work as seeming "amateur" and that the laborers used had a hard time with concrete finishing. DP identified Elijah Gavn on a photo lineup provided by law enforcement.

59. Investigators interviewed a sixth victim, JC, who reported that in or about May 2024, she hired "Thomas" of Ace Contractors Corp to fix a leak in the foundation of her house. JC requested referrals from a home services repair listing website and received a call from "Thomas" using phone number (201) 362-4114. "Thomas" stated he owned Ace Contractors Corp and would come to JC's property to do the estimate. During the estimate, "Thomas" provided JC an Ace Contractors Corp business card depicting (201) 681-0895 ("Target Phone 2").

60. According to JC, the work began on or about May 3, 2024, and ended on or about May 9, 2024. When JC went to make the first payment of $6,000, "Thomas" told JC to make a check out to "Elijah Gavin" because "that is the guy [I] am going to buy the supplies from." JC made an additional payment of $1,000. When JC asked "Thomas" for permits, JC stated he became "hostile and unprofessional" and threatened to undo the work previously done to JC's residence. JC stated she canceled the checks totaling $7,000 after suspecting fraud and reported the incident to the East Orange Police Department. In or around May 2024, JC identified "Thomas" as Gavin after searching the internet and finding a news article stating he is wanted in Ireland. JC then contacted law enforcement.

## CONCLUSION

61. I submit that there is probable cause to believe that between March 2023 and May 2024, Elijah Gavin a/k/a Timothy O'Reilly a/k/a Elijah Thomas (YOB 1995) committed violations of 18 U.S.C. § 1349 (wire fraud conspiracy), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1956 (money laundering). I request that an arrest warrant be issued.

Respectfully submitted,

JODIE DONAGHY
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. **Sworn telephonically and signed electronically**

January 21, 2025
*Date*

*Judge's signature*

**Providence, Rhode Island**
*City and State*

**Patricia A. Sullivan, USMJ**
*Patricia A. Sullivan, U.S. Magistrate Judge*