# Exhibit 10

1:25-mj-00014 PAS

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT AND SEARCH WARRANT**

I, Kurt Ripke, a Task Force Officer with the Department of Homeland Security, Homeland Security Investigations ("HSI"), having been duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a police officer within the State of Rhode Island since January of 2014, and I have been a police officer with the East Providence Police Department since March of 2018. I served in the rank of Detective Corporal in an acting capacity since April of 2022 and was promoted to the permanent rank of Detective Corporal in November of 2022. I was most recently promoted to the rank of Sergeant as of February 2, 2025.

2. In March of 2024, I was assigned to HSI and was designated as a Title 19 Task Force Officer ("TFO"). I am currently assigned to conduct investigations in the HSI Providence Office. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

## PURPOSE OF THE AFFIDAVIT

4. Based upon the facts presented in this affidavit, there is probable cause to believe that John OBRIEN (hereinafter, "OBRIEN") (YOB 1997) committed violations of federal law, namely wire fraud (18 U.S.C. § 1343) and conspiracy to commit wire fraud (18 U.S.C. § 1349)

(hereinafter, the SUBJECT OFFENSES). This affidavit is submitted in support of a Criminal Complaint and Arrest Warrant charging OBRIEN with the SUBJECT OFFENSES.

5. OBRIEN entered the country on July 22, 2021 and was admitted to the United States as a waiver-tourist (WT) visitor for pleasure under the Visa Waiver Program ("VWP"). OBRIEN was authorized to remain in the United States until October 19, 2021. He overstayed his visa and is in the country illegally and ineligible for employment. He is currently in the custody of immigration officials.



6. Because probable cause exists to believe OBRIEN committed the SUBJECT OFFENSES, for the reasons set forth below, probable cause exists to believe that evidence, fruits, and instrumentalities of these SUBJECT OFFENSES will be found in the following places, also set forth in Attachment A-1 and Attachment A-2:

a. Attachment A-1: Apple iPhone ("SUBJECT DEVICE 1") with cracked rear casing and front screen currently in the custody HSI RAC Providence located at 443 Jefferson Blvd, Warwick, RI 02886

b. Attachment A-2: black Samsung Cell Phone ("SUBJECT DEVICE 2") currently in the custody HSI RAC Providence located at 443 Jefferson Blvd, Warwick, RI

02886

7. The applied-for warrants would authorize the forensic examination of the devices described in Attachments A-1 and A-2 (collectively, the "SUBJECT DEVICES") for the purpose of identifying electronically stored data particularly described in Attachment B.

8. Between July of 2021 through in or about March 28, 2025, in the District of Rhode Island and elsewhere, OBRIEN and others known and unknown (collectively "the Targets") defrauded property owners in Massachusetts and Rhode Island by fraudulently inducing them to hire the Targets to conduct building repairs. The Targets' scheme, which is becoming increasingly common throughout the United States, has come to be known as The Traveling Conmen Fraud Group ("TTCFG").[1] As part of the scheme, OBRIEN and those working with him misrepresented the qualifications of their construction businesses that they supposedly operated, the need for the services offered, and the nature of the work to be performed. In total, the Targets defrauded and attempted to defraud property owners of a significant amount of U.S. Currency, estimated to be over $1,000,000.

---

[1] I am aware that The Traveling Conmen Fraud Group or Travelers has been recognized by the Federal Bureau of Investigation's ("FBI") Terrorist Screening Center as a Transnational Organized Crime (TCO) group. While not a centrally organized group, the Travelers are groups of Irish or U.K. nationals who enter the United States on pleasure or tourist visas and overstay their visits or, more commonly, enter the United States illegally. Once in the United States, Travelers go to different cities and states, soliciting construction work. This is sometimes done door-to-door, by knocking and introducing themselves to homeowners, usually elderly individuals, claiming to have extra materials left over from a prior job or noticing a defect or damage to the home that needs to be repaired immediately. The members often quote a low price, and then, after further inspection, demand much more money. In addition to door-to-door "marketing," some members go to the lengths of creating a website and social media postings or even using mass mailers through the U.S. Post Office. Travelers usually start with a small job (such as fixing brick entry steps or re-pointing chimneys) and then convince homeowners that their homes need major repairs, such as foundation work or waterproofing. At this point, the Travelers overcharge homeowners and sometimes intimidate homeowners into paying them up front for work that is not completed. Travelers often hire day laborers to conduct most of the physical work on a jobsite. Travelers do not have work authorization documents, and their businesses are usually not registered with the state where they claim to have a business. Traveler groups do not pull local permits for their work and do low quality, unnecessary, or incomplete mason/roofing work, sometimes damaging homeowners' residences.

## PROBABLE CAUSE

### VICTIM 1's Complaint to the Warwick Police Department

9. On or about March 27, 2025, VICTIM 1, reported to Officer Rosa of the Warwick Police Department that on or about March 24 and March 25, 2025, he was approached at his residence, XX Gillooly Drive, Warwick RI 02888 by a contractor from TRADITIONAL MASONRY & CONSTRUCTION.

10. VICTIM 1 explained that the contractor identified himself as "John OBRIEN."[2] OBRIEN informed VICTIM 1 that he had observed VICTIM 1's property and foundation while conducting other work in the neighborhood. Based on OBRIEN's alleged external observations of VICTIM 1's property, while in the neighborhood, OBRIEN determined that VICTIM 1 had cracks in his foundation which needed repairs. OBRIEN said he could professionally repair these cracks for $4,000.

11. OBRIEN informed VICTIM 1 that he was from Ireland. VICTIM 1 stated that he felt a bond with OBRIEN over their shared heritage, and that this bond caused VICTIM 1 to "trust" OBRIEN. OBRIEN provided VICTIM 1 with a post card style flyer for "Traditional Masonry & Construction." The phone number 617-866-7676 and website of www.TraditionalMasonryandConstruction.com was listed on the front of the flyer, along with generic construction/masonry photographs.

12. OBRIEN informed VICTIM 1 that in order to repair the cracks in VICTIM 1's foundation, OBRIEN would have to dig an 8-inch trench around the house to perform repairs and

---

[2] Prior to this investigation, VICTIM 1 provided the name and spelling of "John OBRIAN" to the Warwick Police Department. Department of Homeland Security records and checks of registration information obtained during surveillance revealed the proper identification is in fact John OBRIEN (YOB 1997). A New York Driver's License was also located on scene further confirming the identity of John OBRIEN. The NY DL was issued on 04/25/2023 using DL #188 275 245 out of Harrison, NY. In the summary of the Warwick Police Report, the reference to "OBRIAN" is in fact the subject of this investigation "John OBRIEN."

assess any other unseen damage. VICTIM 1 agreed to the work. VICTIM 1 informed Officer Rosa that the workers dug a 4-foot-deep trench along the foundation, spanning across the length of the rear and side of VICTIM 1's house.

13. Following completion of the trench, OBRIEN informed VICTIM 1 that unforeseen damage had been unearthed by the excavation. According to OBRIEN, it would now cost $9,500 to complete the foundation repairs. VICTIM 1 paid the new quote by Check #585, which was cashed on March 27, 2025. VICTIM 1 paid this check from his Wave Federal Credit Union account. VICTIM 1 informed investigators later that he observed the check had been cashed before he was able to stop the payment.

14. On March 27, 2025, OBRIEN returned to VICTIM 1's residence to continue to work on the foundation. Around this time, OBRIEN asked VICTIM 1 how much he paid for the house. Shortly thereafter, OBRIEN told VICTIM 1 that due to additional extensive damage uncovered along the foundation as a result of the excavation, it would now cost $95,000 to complete the project. OBRIEN drew up a contract and provided it to VICTIM 1.

15. VICTIM 1 disputed the price and wanted the initial $9,500 to count towards the new contract amount. OBRIEN prepared a second contract for $80,000. A copy of this contract was seized by Officer Rosa as evidence.

16. VICTIM 1 did not have $80,000 in cash. He went to Wave Federal Credit Union and then to Citizens Bank, who ultimately agreed to provide him a line of credit loan. VICTIM 1 informed Officer Rosa that he was to confirm the loan with Citizens Bank on March 28, 2025, and that OBRIEN would be coming by the house to collect the $80,000 in cash or check. VICTIM 1 also said that he had attempted to stop payment of the $9,500 check that he had provided to OBRIEN, but it had already been cashed at a TD Bank in Providence, RI.

17. VICTIM 1 provided a written statement to the Warwick Police Department and requested charges be brought against OBRIEN for taking advantage of him and damaging his property. On March 27, 2025, the Warwick Police Department photographed the damage to VICTIM 1's residence and conducted checks of OBRIEN's business, Traditional Masonry & Construction. The checks revealed that Traditional Masonry & Construction is not registered to operate in Rhode Island. Further checks by investigators later revealed that Traditional Masonry & Construction is not registered with the State of Massachusetts. Further investigation revealed that neither Traditional Masonry & Construction nor OBRIEN pulled permits with the City of Warwick to conduct work on VICTIM 1's house.

18. In the statement provided by VICTIM 1 to the Warwick Police Department, he noted that OBRIEN also worked on his neighbor's house, VICTIM 2.

**Administrative Arrest of John OBRIEN**

19. On March 28, 2025, members of HSI conducted surveillance in the area of Gillooly Drive, Warwick, RI. Two vehicles, a Toyota pickup truck color gold with a Rhode Island Registration (RI CO 1UU564 – which did not match the vehicle) and a White Dodge Ram with a Massachusetts Commercial Registration (Y48955) were parked in front of XX Gillooly Drive, across from VICTIM 1's residence. Investigators were unable to locate OBRIEN at this time.

20. A check of the registration plates to the above-mentioned vehicles revealed the gold Toyota pickup truck to have a registration plate affixed belonging to an individual from Pawtucket, RI. The white Dodge Ram was observed to be registered to John OBRIEN with an address of 2 Neptune Road #219, East Boston, MA 02128. I confirmed via an online search that 2 Neptune Road #219, East Boston, MA 02128 is a UPS store. Based on my training and experience, I am aware that members of TTCFG often use fraudulent addresses to register vehicles and businesses, and that some of these addresses in fact are UPS Stores or other unrelated store fronts.

21. VICTIM 1 informed investigators that OBRIEN has been driving a dark colored pickup truck with a Massachusetts registration. At approximately 10:30 am on March 28, 2025, OBRIEN drove onto Gillooly Drive in Warwick, Rhode Island and parked across from VICTIM 1’s residence. OBRIEN was operating a dark colored Chevrolet Silverado bearing Massachusetts registration 4BAX13.

22. According to the Massachusetts Department of Motor Vehicles, this vehicle is registered to John Paul OBRIEN of 50 Edgewater Drive, Framingham, MA 01702. As the vehicle approached and stopped across from VICTIM 1’s residence, OBRIEN was approached by Agents from HSI. OBRIEN was administratively arrested due to his immigration status by Special Agents from HSI.

23. Following the administrative arrest of OBRIEN, a search of the Chevrolet Silverado bearing MA Registration 4BAX13 was conducted. The search revealed hundreds of Traditional Masonry & Construction flyers in addition to large yard sign advertisements for Traditional Masonry & Construction. A TD Bank Debit Card was observed on the center console. Inside the truck, investigators located incomplete Traditional Masonry & Construction contracts for VICTIM 1 and his neighbor, VICTIM 2. The Apple iPhone, “SUBJECT DEVICE 1,” was on OBRIEN’s person and in his hand when he was taken into HSI custody. SUBJECT DEVICE 2 was located in the truck. Investigators seized the SUBJECT DEVICES and secured them in anticipation of obtaining a search warrant. A large envelope from TD Bank with a large amount of cash was observed in the center console.

24. In addition to these items, four (4) binders containing quotes, contracts, and invoices for Traditional Masonry & Construction were located in the Chevrolet Silverado.

25. The two cell phones, the SUBJECT DEVICES, were both seized as evidence. Prior to the phones being placed in airplane mode, messages were actively popping up on the front of

the Apple iPhone from a WhatsApp Group Chat called "Please fix the electric," "Rolexs Group," and other application notifications. Based upon my familiarity with other TTCFG investigations, I know that Rolex watches are a common means of laundering fraudulent proceeds.[3]

26. Also located in the Chevrolet Silverado driven by OBRIEN was a copy of the Edward F. Sullivan Insurance Agency Liability Certificate that was provided to a Pawtucket, RI victim, discussed further below, as well as additional ledgers and receipts, including a TD Bank statement for OBRIEN.

27. A Town of Sharon MA Notice of Outstanding Invoices dated May 14, 2024, was also located in the vehicle. The Notice of Outstanding Invoices listed five different vehicles on which OBRIEN owed excise tax and a sixth vehicle with an outstanding parking violation totaling $1,727.77. A Massachusetts Registry of Motor Vehicles registration for a seventh vehicle was identified for a 2015 Chevy Silverado color brown which is active through August 31, 2025. An eighth vehicle, a 2024 Landrover Discovery bearing MA 5SCX11, was identified via a Massachusetts Registry of Motor Vehicles document located within the Chevrolet Silverado driven by OBRIEN, registered to OBRIEN.

28. The total amount of cash in the vehicle was $5,565, including $5,400 in the TD Bank envelope.

29. In addition, two checks were found in the vehicle. The first check was written out to Traditional Masonry & Construction for $3,200 from individuals of XXX Fair St, Warwick RI

---

[3] From my training and experience and conversations with other law enforcement officials to include HSI Special Agents from neighboring offices, I know that individuals associated with TTCFG use various methods of money laundering to include, high-end jewelry (specifically ROLEX watches), high-end purses and bags, crypto currency, and third-party person(s) willing to transfer the money into other proceeds or wire it to overseas accounts. TTCFG members often use the proceeds of their construction fraud schemes to purchase luxury vehicles and expensive jewelry (such as Rolex watches). In my experience, luxury items such as Rolex watches are used to transport proceeds across borders without alerting law enforcement. TTCFG members can hide their proceeds in these luxury items which can be easily re-sold, further concealing the true source of the funds.

and dated March 4, 2025. The second check was written out to OBRIEN for $6,800 from individuals of XX Holburn Ave, Cranston RI and dated January 20, 2025. The backs of the checks were endorsed “John OBRIEN” and “TMC 617-866-7676” respectively.

30. HSI TFO Smith reviewed all of the documents contained in the four binders seized from the Chevrolet Silverado driven by OBRIEN bearing Massachusetts registration 4BAX13. The binders consisted primarily of contracts between Traditional Masonry & Construction and Rhode Island residents for various residential construction projects dated between April 2024 through March 2025. Amounts listed on the contracts ranged between $300.00 to $205,000.00. The approximate value of the contracts contained within the binders totaled $1,987,650.00. Resident addresses are in Warwick, RI, Cranston, RI, Providence, RI, and Pawtucket, RI. A review of those contracts revealed that in many instances, customers were provided with an initial contract for an amount ranging between a few hundred dollars to a few thousand dollars, followed by a contract dated several days later for an amount valued significantly higher based upon additional work that was allegedly needed.

**Interview with VICTIM 1 – Warwick, RI**

31. As the criminal investigation continued, investigators spoke with VICTIM 1 at his residence on March 28, 2025. VICTIM 1 said that he was set to take out a $200,000 line of credit on the house in order to pay OBRIEN the additional $80,000. VICTIM 1 thought it was odd that OBRIEN asked how much his house was worth and how much he owed on the house.

32. During my visit to VICTIM 1’s residence, we walked the property. By this time, there was an approximate 4-foot-deep trench around the left side and the length of the rear of the home. The front foundation was dug out only an approximate 8 inches and the side along the driveway left untouched. I observed what appeared to be fresh damage and chips to the concrete foundation around the entirety of the residence. I believed this damage to be recent because the

damage, which appeared in the form of snake-like etchings along the foundation, was white and clean, notwithstanding that these etchings sat below the ground level. If this damage existed prior to OBRIEN and his team digging the trench, I would expect these etchings to be covered in dirt.





33. VICTIM 1 believed Traditional Masonry & Construction was intentionally damaging his foundation in order to make it appear that his foundation had extensive damage and

required additional, expensive repairs. VICTIM 1 informed me that he heard some hammering into the foundation when the workers were digging the trench. I observed numerous hammers, and a pile of nails stuck through cardboard, which appeared consistent with using them as a chisel to break away the concrete.



34. VICTIM 1 informed me that at one point, OBRIEN came into the house with him and inspected the basement to see if there was water damage. VICTIM 1 stated that while he and OBRIEN were in the basement, he believes OBRIEN's crew chipped away the foundation outside to create the illusion of water damage. VICTIM 1 reported he heard what he believed to be hammering and chiseling, which led him to believe the crew was banging on the foundation while he was in the basement with OBRIEN.

**<u>Inspection of VICTIM 1's Property</u>**

35. On March 31, 2025, I met with an inspector from a home inspections business in Rhode Island (hereinafter, the "Inspector"), together with VICTIM 1 at XX Gillooly Drive. The Inspector was hired by the United States Attorney's Office for the District of Rhode Island to conduct an inspection and provide an opinion on the victim addresses. The Inspector conducted an exterior inspection of VICTIM 1's property and took photographs.

36. From the ground level up, the Inspector was unable to observe any obvious cracking along the front or side of the house that would raise concern about the foundation's structural integrity. Furthermore, the Inspector observed nothing that would justify the degree of digging conducted by OBRIEN's crew to identify foundational issues. According to the Inspector, he would only expect a contractor to excavate around the foundation if there was indicia of structural issues or water damage along the foundation at the ground level or above. The Inspector observed no such indicia while conducting his inspection. With respect to the alleged cracks below ground level, the Inspector noted that these would have been covered by ground level dirt and garden vegetation, and therefore not visible to someone standing on the street, as OBRIEN claimed to have done.

37. The Inspector also noted the blue spray paint that was used by Traditional Masonry & Construction crew, apparently to mark areas of concern in the foundation. The Inspector was unsure what some of those markings were for and to what they were pointing. In at least one instance, he did not see any issues with the area marked by a blue arrow.

38. VICTIM 1 escorted the Inspector to the rear of residence. The Inspector stated that he was looking for cracks at the corners of the windows of the house or from the top of the foundation area down that would raise concern of the foundation shifting or water damage. The Inspector found none. The Inspector mentioned again that there would be no reason to continue

digging so far down around the foundation if there were no visible cracks above ground level that could be observed.

39. VICTIM 1 informed the Inspector and me that family members came to his house over the weekend in an effort to repair some of the damage caused by OBRIEN. His family applied a waterproof black paint around the recently exposed foundation. The Inspector noted that it was therefore difficult to tell if the etchings he observed were in fact naturally occurring cracks or recently man-made because they had been painted over. He stated he would review the photographs taken by HSI on March 28, 2025 prior to the painting.

40. The Inspector then inspected VICTIM 1's basement. The Inspector said he could smell no odor of moisture or water damage in the basement. He was unable to see any fresh water damage or any obvious cracks. The Inspector did say there appeared to be some old water on the floor, but nothing that appeared recent or would cause concern.

41. The Inspector looked upstairs on the first floor. He explained he was again looking for cracks in the corners of the windows, ceilings, or walls that would suggest the foundation was shifting or had moved. The Inspector was unable to identify anything of the sort on the first floor.

42. While speaking with the Inspector and me in the front of the residence, VICTIM 1 mentioned that OBRIEN also suggested he get his chimney repointed. OBRIEN told VICTIM 1 he could save him $2,200 if he worked with OBRIEN. VICTIM 1 stated that neither OBRIEN nor a member of his crew ever went on the roof but told him that the chimney had holes in it, as indicated by black markings on the chimney. OBRIEN told VICTIM 1 to cancel his chimney guy and that he would take care of it for him.

43. The Inspector acknowledged the chimney has some wear from where an old antenna previously sat and that it might need to be worked on one day in the future. However, from his position on the ground, he believed the black markings to be normal weathering on the

mortar between the bricks. He commented that it would be difficult to make an assessment of the chimney without going on the roof. The Inspector informed VICTIM 1 that a job such as that should typically not cost him anymore than two thousand dollars.

**Interview with VICTIM 2– Warwick, RI**

44. TFO Smith and I spoke with VICTIM 1's neighbor across the street on Gillooly Drive. OBRIEN worked on this residence prior to working on VICTIM 1's house. The homeowners, VICTIM 2 & his wife (ages 86 and 85), stated that on or around March 20, 2025, a flyer for Traditional Masonry & Construction was left at their house. Approximately one week later, OBRIEN showed up at the residence.

45. VICTIM 2 spoke with OBRIEN and told him they needed the front steps to the house repaired. OBRIEN agreed to repair the front steps for $7,000 and provided VICTIM 2 with a contract. VICTIM 2 wrote Check #287 from his Santander Account to OBRIEN.

46. VICTIM 2 provided HSI with a copy of the contract he received from OBRIEN. In the top right-hand corner of the contract, the name "John O'BRIEN" is written in the same color ink and handwriting as that of the contract details.

47. VICTIM 2 told HSI that OBRIEN asked him about water in the residence and informed VICTIM 2 that the foundation may need to be repaired. VICTIM 2 told OBRIEN that he had not had water in the basement in years and that the basement was dry. According to VICTIM 2, OBRIEN later agreed with VICTIM 2 and said that he was correct, and the foundation was likely fine, but that the bulkhead stone stairway in the backyard was cracking. According to VICTIM 2, OBRIEN did not enter the basement to his residence.

48. OBRIEN was able to get VICTIM 2 to agree to have the block concrete stairwell demolished and rebuilt with new blue stone pavers. The total cost of this was going to be an

additional $17,000. VICTIM 2's prior payment of $7,000 for the steps was used as a deposit. In total, VICTIM 2 would pay OBRIEN $24,000 for the front steps and rear bulkhead stone steps.

49. VICTIM 2 and his wife said that OBRIEN was very friendly and showed up to work each day. He even bought VICTIM 2 two 4-packs of Guinness beer for VICTIM 2 to drink.

50. At the time I interviewed VICTIM 2 and his wife, OBRIEN and his crew had started and nearly completed work on the front steps and started work on the back stairwell.



**Inspection of VICTIM 2's Property**

51. On March 31, 2025, following the Inspector's inspection of XX Gillooly Drive with VICTIM 1, we visited XX Gillooly Drive with VICTIM 2. There, VICTIM 2 directed the Inspector to two areas on his property where OBRIEN and his crew performed work: first, the front stairs; and second, the back stairwell and block wall.

52. The Inspector was first directed to the front steps that were covered with a blue tarp to keep elements out. The Inspector could not assess the condition of the original steps because

OBRIEN's crew had already performed work on the area. However, the Inspector did notice some rot at the base of the door and the steps. VICTIM 2 told the Inspector that OBRIEN advised him that repairs were necessary because the steps were cracking, and VICTIM 2 would not want his wife to fall on them. VICTIM 2 reported that OBRIEN told him that there was water underneath the front steps and the foundation appeared to have some cracks in it. VICTIM 2 noted that he has never had water in that corner of the house and the basement was dry.

53. VICTIM 2 then directed the Inspector to the back of the property. VICTIM 2 explained that OBRIEN told him that the bulkhead stairwell and block walls in the back of the property were corroding, and the entire block wall and steps were going to crumble and collapse. VICTIM 2 informed the Inspector and me that before he knew it, OBRIEN's workers were already chipping apart the bulkhead stairs, even though he had not agreed to a new contract with OBRIEN.

54. The Inspector observed the bulkhead stairwell and block walls. He informed VICTIM 2 that the water between the blocks was normal, that there was a little corrosion at the top of the wall, but that is standard with the material. The Inspector informed VICTIM 2 the wall was solid, and it was not going to collapse.

**Interview of VICTIM 3 and VICTIM 4 – Pawtucket, RI**

55. As part of the investigation, I interviewed VICTIM 3 and VICTIM 4, victims living in Pawtucket, RI. They informed me that OBRIEN represented to them that he was an insured contractor and provided them with a certificate of commercial liability insurance.

56. VICTIM 3 and VICTIM 4 are the owners of XX Wilcox Ave. Pawtucket, a single-family, single-story bungalow with an unfinished basement. Pawtucket property records show the residence assessed at $490,900 as of 2023, with a building replacement value of $268,848.

57. In January 2025, VICTIM 3 was approached by OBRIEN regarding repairs needed to his house foundation, which he described as having peeling stucco. VICTIM 3 stated that OBRIEN was conducting repairs to a neighbor's house at the time. OBRIEN was contracted by VICTIM 3 to rebuild one wall of the house foundation. VICTIM 3 said that he was aware of issues with the foundation, which included water intrusion with efflorescence on the interior basement walls.

58. VICTIM 3 described a process of digging out the soil surrounding the foundation wall to the footing, patching the inside walls with hydraulic cement, placing black tar over the excavated exterior wall, and back filling with 50-60 bags of concrete. The work was completed over a period of three weeks with the crew working every day.

59. VICTIM 3 paid OBRIEN a total of $111,000 in a series of installments and funded the cost via a home equity line of credit with Coastal1 Credit Union. VICTIM 3 described feeling "stuck," in that he needed the repairs done, but felt that he had significantly overpaid for the actual work performed.

60. In total, VICTIM 3 had four contracts with Traditional Masonry & Construction dated between January 20, 2025 – January 31, 2025, ranging in dollar amounts from $1,799 to $94,000. The contract valued at $94,000, dated January 28, 2025, noted the work came with a "25 year warranty."

61. OBRIEN also provided VICTIM 3 with a certificate of commercial liability insurance issued by Edward F. Sullivan Insurance Agency of Dedham, MA. I spoke with a representative from the insurance company ("the Representative"), who confirmed that Traditional Masonry & Construction requested insurance coverage in March of 2024, which was granted on March 7, 2024. The insurance coverage was listed under the business of Traditional Masonry, 10 Thurlow St, Boston, MA 02132. The certificate holder for this policy was listed as

Case 1:25-mj-01-00443 Document 3-1 Filed 04/2/25 Page 18 of 36 PageID #: 21

John OBRIEN. Only a first name is provided for the owner of the policy, and that first name matches the first name of JO2, OBRIEN's brother. The phone number associated with the policy is 617-866-7676 (the number listed on Traditional Masonry documents), and the email associated with the policy is Traditionalmasonry12@gmail.com. The Representative stated that payment was never made by Traditional Masonry & Construction. As a result, coverage was terminated on June 5, 2024 and Traditional Masonry & Construction was notified of the termination of coverage. This confirmed that the certificate of commercial liability insurance provided to VICTIM 3 by OBRIEN was not active at the time this work was conducted.

**Interview of VICTIM 5 – Warwick, RI**

62. On March 28, 2025, TFO Smith contacted VICTIM 5 and learned that in February 2025, OBRIEN responded to her residence and offered to perform work on her residence. VICTIM 5 reported that while the initially agreed upon work was being performed for approximately $3,000, OBRIEN informed her that the foundation to her residence had cracks and damage. VICTIM 5 reported that OBRIEN requested to enter her basement and conduct a full inspection of her basement, which resulted in the discovery of additional work needed to repair the foundation.

63. VICTIM 5 reported that she received a new contract in the amount of $75,000.00 to repair her foundation. VICTIM 5 reported that OBRIEN explained the importance of performing this work promptly and that she was unable to get additional quotes from outside contractors due to workers having started to dig around the foundation.

64. VICTIM 5 stated that based upon learning her foundation was damaged and with knowledge of rain in the weather forecast, she believed it was necessary for OBRIEN to conduct the work. VICTIM 5 reported that the work lasted approximately two weeks. VICTIM 5 reported that there is still concrete in the back of her yard because of the work performed.

65. Warwick Police Detectives reported on March 31, 2025 to TFO Smith that they conducted an additional follow up with VICTIM 5.

66. VICTIM 5 informed Warwick Detective Nadine Parmenter that she had previously spoken with TFO Smith on Friday, March 28, 2025. VICTIM 5 wishes to press charges.

67. VICTIM 5 stated she dealt with an Irish man identifying himself as John O'Brien. OBRIEN presented a card with the companies' insurance information.

68. OBRIEN repaired a crack in the foundation/front steps, and the total cost of the project was $75,000, which she paid by check in increments of $9,500.00. The check installments were made out to OBRIEN and not the business, which VICTIM 5 thought was odd. When VICTIM 5 questioned OBRIEN about it, he claimed he was in the process of transferring the business over from his father.

69. OBRIEN came back after the project was completed and gave her a $500 cash referral bonus. VICTIM 5 spent $100, but still has the other (4) $100 bills.

70. VICTIM 5 was originally satisfied with their work, and now realizes it was a scam and overpriced. VICTIM 5 is concerned about the structural integrity of her foundation.

**Interview of VICTIM 9 – Providence, RI**

71. On March 29, 2025, I conducted a phone interview with VICTIM 9 of XXX Roger Williams Ave, Providence, RI. I informed VICTIM 9 that I was conducting an investigation into Traditional Masonry & Construction. VICTIM 9 acknowledged that the company had done some work on her house last August (2024).

72. When asked about her introduction to Traditional Masonry & Company, VICTIM 9 explained that she was approached by a young man named John with an Irish accent and fair skin from Attleboro, MA who was doing work in her neighborhood. He told her that her front steps needed repairs. She agreed to a quote of $800. John started working, and as the work

progressed, he informed VICTIM 9 that he had identified additional issues, including a crumbling foundation under the stairs and cracks in the house's foundation. Eventually, John's crew dug a five-foot-deep trench around three sides of VICTIM 9's house and filled it with concrete. VICTIM 9 was told by John that he needed payment before he could run the cement into the trenches.

73. VICTIM 9 said John showed her the work as it progressed. He repeatedly told her he was worried about her foundation, though she had never had a leak. He showed her two cracks on either side of the corner of her house, and at the time, he stuck a coat hanger through the crack to demonstrate how wide it was. This helped convince VICTIM 9 that she needed the repairs. He told her he was worried the house was going to shift and the upper part of the house would lean out. He also told her that repairs would be much worse if that happened.

74. In total, VICTIM 9 spent about $205,000 on these alleged improvements. VICTIM 9 mentioned that a friend of a friend came by and looked at the work and believed that it was solid work, but that she likely paid too much. VICTIM 9 stated that she has not had any issues with the house or the foundation or water leaking since. VICTIM 9 said she did not have any water issues prior to the work.

75. VICTIM 9 paid for the work via multiple checks to Traditional Masonry & Construction with funds from her Rhode Island-based Citizens Bank Account. These checks included a personal check drawn on her account, as well as cashier checks that she purchased. Some of these checks were cashed at PLS Check Cashers in Dorchester, MA.[4] VICTIM 9 made the payments in cashier checks, and stated she has the receipts from all of them. In total, she wrote

[4] PLS Check Cashers located in Dorchester, MA where John OBRIEN cashed multiple checks from VICTIM 9 is also the same facility at which O'BRIENs brother, JO2, cashed approximately $350,000 worth of checks between August 9, 2021 and February 1, 2023, along with three other co-conspirators. This activity is part of another HSI Providence investigation that originated from a $196,000 loss to an East Providence victim. "JO2" and the other three subjects were identified and found to have cashed $1.25 million in checks over an approximate 10-month period at the same PLS Check Cashers facility.

eight checks to Traditional Masonry & Construction between August 13, 2024 through September 4, 2024 for a total amount of $205,700.[5]

76. VICTIM 9 provided investigators with copies of six different Quotation/Contracts from Traditional Masonry & Construction written out to her, ranging from $800 - $205,000 between August 12, 2024 through September 5, 2024. The final contract stated that the work was guaranteed by a 25-year warranty.

77. VICTIM 9 stated that John came by once in December of 2024 with a bottle of some kind of alcohol to check in and see how everything was.

78. VICTIM 9 said she will be paying for this project for a while, and it really put her back financially. VICTIM 9 stated that she had to borrow some money to get the project done, and that she had to do it because there were issues with her foundation.

**<u>Interview of VICTIM 6– Providence, RI</u>**

79. On March 29, 2025, I conducted a phone interview with VICTIM 6 of XXX Summit Ave, Providence, RI. I informed VICTIM 6 that I was conducting an investigation into Traditional Masonry & Construction and that I had found her contact information in a binder of Traditional Masonry & Construction contracts seized from the target.

80. VICTIM 6 had been contacted by OBRIEN of Traditional Masonry & Construction, but opted not to work with him after he was unable to produce a valid insurance document or license for the company.

---

[5] A number of the Citizens Bank checks from VICTIM 9 to OBRIEN were cashed at the PLS Check Cashers facility in Dorchester, MA. I have spoken with an investigator from Citizens Bank. He explained to me that the cashing of Citizens Bank cashier checks and the Citizens Bank check drawn on the account of VICTIM 9 would result in an interstate electronic communication between the Federal Reserve Bank in Boston, MA and Citizens Bank in Providence, RI.

81. VICTIM 6 said she was approached by a man whom she believed was named John. She described him as a younger Irishman whom she believed was working with his father. John came to her home and said he could provide her with a good deal to have her front steps repaired. He provided her with a flyer slightly larger than a postcard for Traditional Masonry & Construction. Initially, she agreed to work with John. However, shortly thereafter, she learned of construction scams taking place in Rhode Island. She researched the company online and did not believe the results to be credible. She also asked John to provide proof of registration and insurance. He was unable to provide the requested documentation, and so she ultimately did not hire him.

82. She stated she communicated with John via text and calls. The number VICTIM 6 used to contact John was 617-866-7676. John also left VICTIM 6 a voicemail, in which a male with an Irish brogue identified himself as John from Traditional Masonry & Construction, the guy who did "[Neighbor]'s property next door."

**<u>Interview of VICTIM 7 – Warwick, RI</u>**

83. Warwick Police Detective Nadine Parmenter spoke with VICTIM 7. VICTIM 7 reported she was outside in her yard when she was approached by a young handsome "front man" with an Irish accent in a truck offering to work on her chimney, later she identifies him as "Martin McDonagh."

84. On March 10, 2025, VICTIM 7 received an initial quote of $1,500.00. The second day VICTIM 7 said a man with an Irish accent claiming to be "McDonagh's" brother, OBRIEN (reddish balding hair), arrived.

85. VICTIM 7 stated that now the original quote changed from $1,500.00 up to $25,000.00 then back down a little to $15,000.00. VICTIM 7 described them as being very

aggressive and she felt forced by them to agree to the work. VICTIM 7 informed Detective Parmenter that they entered parts of her house without her permission, specifically the bulkhead.

86. VICTIM 7 received an invoice from them listing the business as Traditional Masonry & Construction with a Boston address and an address out of Pawtucket, 45 Denver Street VICTIM 7 paid Traditional Masonry & Construction via check, which she ultimately stopped payment on once she realized this was not a legitimate company.

87. VICTIM 7 noted that she checked the State of RI business database and was unable to locate their licenses/business.

88. On the last day at VICTIM 7's house, OBRIEN and company refused to leave without getting paid for additional work. VICTIM 7 wrote a check for a few hundred dollars and wrote in the memo "chimney scam." When OBRIEN realized this, he became upset and demanded she write another check without the memo. VICTIM 7 refused to write another check, and OBRIEN ripped up the check in front of her before leaving.

89. HSI investigated 45 Denver Street in Pawtucket, RI, and attempts were made to contact the residents of the apartment complex at that address. 45 Denver Street Pawtucket is a two family, two floor residence. Pawtucket Police call history shows the most recent contact at this address was on February 29, 2024 when police made contact with the occupant at apartment 2. A call history review dating back to 2006 showed no calls for service involving any persons with the last name O'Brien at this address. Pawtucket property records showed the residence to be owned by other individuals (not OBRIEN), with a purchase date of April 15, 2024.

90. On March 31, 2025, TFO Harrington responded to 45 Denver Street An attempt to make contact with a resident was made. There was no answer at any door. The name of the occupant (not OBRIEN) was found to be on the 1st floor unit mailbox. The 2nd floor mailbox was unlabeled, but the last names of other individuals were present on a lock box located below the

mailboxes. Trash and recycling bins were present and labeled apartment 1 and 2. An Amazon package bearing the name of another individual (not OBRIEN) was located next to the front door steps. A gray Hyundai Tucson was in the driveway. This vehicle was actively registered to an individual with the initials of another person at 45 Denver Street apartment 2.

91. Multiple attempts both via phone and in person have been made to contact the occupant of apartment 2 with negative results. As of the date of this affidavit there is no evidence the Pawtucket, RI address used by Traditional Masonry & Construction has any connection to OBRIEN or the company.

**10 Thurlow Street**

92. The address of 10 Thurlow Street, Boston (West Roxbury) MA was investigated. Using law enforcement databases and open-source searches, there is no evidence of OBRIEN, JO2, or other known co-conspirators at this address, nor is there evidence of any construction companies such as Traditional Masonry & Construction, Ground Force Landscape, Fix for You Masonry, Detailed Masonry & Construction, or other contractor companies known to be used by OBRIEN at this address.

**Financial Review of John OBRIEN**

93. Based on a preliminary review of banking records obtained to date, OBRIEN and his brother, JO2, a suspected co-conspirator, have conducted numerous financial transactions at multiple different financial institutions. These records provide evidence that OBRIEN has used several construction and masonry companies and has deposited and cashed numerous checks from homeowners for construction related projects. The banking records have also led me to discover that OBRIEN is the subject of at least one additional complaint to law enforcement from 2022.

**VICTIM 8 – West Roxbury, MA**

94. VICTIM 8 (YOB 1942), a widow of West Roxbury, MA, with the assistance of her attorney, reported to law enforcement that she was the victim of contractor fraud perpetrated by OBRIEN and JO2 of Detailed Masonry & Construction. In February 2022, VICTIM 8 reported paying OBRIEN and JO2 over $200,000 for work that was worth between $13,000 and $30,000. VICTIM 8 told the Boston Police Department that these payments were for repair work to her chimney and foundation. The checks received by OBRIEN and JO2 were all reported to have been negotiated at Citizens Bank branches in the Greater Boston area.

95. According to VICTIM 8, OBRIEN and JO2 performed patch work, added a cover to the chimney, and cemented the stone walls of her basement. According to VICTIM 8, the suspects initially charged VICTIM 8 $25,000 for work to the chimney. Then they made repeated requests for more money, in increments of $7,500.00 each, because of supposed problems they found. The suspects then charged VICTIM 8 $175,000 for the repair work done to the foundation. VICTIM 8's attorney reported that his investigation of the contractor's license presented by OBRIEN and JO2 to VICTIM 8 was fraudulent.

96. On March 31, 2025, I interviewed VICTIM 8. She did not recall the OBriens' names but she did remember that they were brothers. She also relayed that they had approached her and told her that they observed that her home needed repairs. They informed VICTIM 8 that there was water damage and foundation concerns, and the issue was only going to get worse if she did not fix it soon. VICTIM 8 stated that these statements made her concerned, and that she did not know any better without her husband, but she did not want the house to fall down. She stated that the individuals showed her the plaster peeling off her walls in the basement advising that it was from water damage.

97. VICTIM 8 advised that she continued to write checks to the two men because they told her they needed more money. When I inquired what she was told the money was for, VICTIM

8 said they needed it for materials and to pay the workers. VICTIM 8 said that she realized that she paid the men more than she should have paid them.

**Banking Activity**

98. OBRIEN and JO2 are the subject of multiple reports from various financial institutions to include Bank of America, Rockland Trust Bank, and Cambridge Savings Bank, among others.

99. On March 31, 2025, I conducted a review of financial documents obtained from Rockland Trust Bank related banking activity engaged in by OBRIEN and JO2 between July 22, 2021 and October 13, 2021.

100. OBRIEN and JO2 had accounts at Rockland Trust with an account address of 1076 Washington Street, Norwood, MA 02062 listed. An open-source search of this address provided on the bank documents for OBRIEN and JO2 showed it to be the store front of "Chris and Sams Barber Shop" or "Happy Nails Norwood," which are not a residence or a construction company.

101. Between July 29, 2021 and October 12, 2021, OBRIEN deposited eight checks totaling $25,800 into his account. These checks had memo lines that related to construction projects. On one of the checks, all of which were endorsed by OBRIEN, he listed the phone number 617-712-5696.

102. During that same time frame, between August 2, 2021 and September 7, 2021, JO2 deposited five checks totaling $14,550 into his Rockland Trust account. These checks had memo lines related to construction projects.

103. After reviewing the Rockland Trust records, I realized that the phone number listed by OBRIEN on a check deposited on August 27, 2021, phone number 617-712-5696, is also the listed number on JO2's PLS Check Cashers Customer Profile. I obtained the PLS Check Cashers records as part of another HSI Providence Investigation. This investigation is a similar construction

fraud scheme, involving JO2, who was listed on the PLS Check Casher Customer Profile as a construction worker for Fix for You Masonry (not Traditional Masonry & Construction). As part of this other investigation, referenced in footnote 4 of this affidavit, JO2 cashed $354,425 worth of checks at PLS Check Cashers in Dorchester, MA from August 9, 2021, through February 1, 2023, the same PLS Check Cashers used by OBRIEN when cashing checks from VICTIM 9.

104. I have also reviewed records from Bank of America, N.A. According to the records provided by Bank of America, OBRIEN and JO2 worked for another company named, GROUND FORCE LANDSCAPE. There were no apparent employment payments via ACH in the account.

105. Between May 31, 2022 and June 22, 2023, OBRIEN and JO2 conducted 74 deposits totaling $220,838 at Bank of America. The majority of these deposits were in cash. A sample of credits revealed 53 cash deposits and 17 check deposits. The check deposits were from multiple persons and financial institutions, including the victims from the other HSI Providence investigation described in footnote 4. The account review also revealed 368 debits totaling $221,233 in the personal accounts of both OBRIEN and JO2. In addition, the records revealed that OBRIEN wired $8,500 from his Bank of America account to a bank in Ireland with "John OBrien" listed as the beneficiary.

**DEVICES TO BE SEARCHED**

106. As noted above, OBRIEN was administratively arrested on March 28, 2025. At the time of his arrest, two cellular devices were located and seized as part of the search, one of which was located on OBRIEN's person, SUBJECT DEVICE 1, and the other which was located inside of the Chevrolet Silverado he was operating, SUBJECT DEVICE 2.

107. The SUBJECT DEVICES are currently in storage at HSI Providence. In my training and experience, I know that the SUBJECT DEVICES have been stored in a manner in

Case 1:25-cr-00443 Document 62-10 04/22/26 Page 28 of 36 Page 29 of 37

which their contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICES first came into the possession of HSI.

**TECHNICAL TERMS**

108. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

c. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THE SUBJECT OFFENSES WILL BE LOCATED IN THE SUBJECT DEVICES**

109. In my training and experience, individuals involved in financial fraud possess and use multiple cellular telephones, computers, media tablets, and other digital media devices to communicate with victims, communicate with co-conspirators, and otherwise facilitate their criminal activity.

a. As described above, OBRIEN used multiple phone numbers (including 617-712-5696 and 617-866-7676) to conduct the SUBJECT OFFENSES, including to communicate with VICTIM 6.

b. As described above, OBRIEN used phone numbers on his flyers and contracts.

c. In my experience investigating these types of cases, I know that individuals engaged in construction fraud schemes take photographs of residences that they use to show victims to try and convince them that repairs are needed.

d. I also know that individuals involved in these types of schemes regularly communicate with their victims via text and telephone call.

e. I also know that in these types of fraud schemes, the fraudsters will photograph checks and conduct electronic deposits using their cell phones.

f. In my experience, individuals involved in schemes of this nature will save victim contact information in their cell phones.

g. I believe that the SUBJECT DEVICES will contain personal identifying

information (PII), checking account numbers, and other financial documents related to victims known and unknown to this investigation.

h. I also believe that OBRIEN engaged in the SUBJECT OFFENSES with other individuals. In my experience, individuals involved in these types of schemes will use messaging applications such as WhatsApp to communicate with each other. I believe that the SUBJECT DEVICES will contain communication regarding the receipt and transfer of victim funds. In my experience, cell phones typically contain contact information, messages, photographs, emails, and other records of connections between co-conspirators. As such, this warrant seeks authorization to search cell phones that may have been used to further the criminal activity.

110. Based on my knowledge, training, and experience, I know that cellular telephones have evolved in their technology such that they can run multiple programs (called applications), function as online banking tools, facilitate the purchase of goods and services online, serve as a repository for multimedia files, and function as communication devices.

111. Based on my training and experience, I know that cellular telephones can be used for:

a. Voice, text, and email communications, through utilization of pre-loaded communications applications or other user-loaded applications that provide similar functionalities, including WhatsApp and Signal;

b. Planning, coordination, and recording notes, through utilization of pre-loaded calendar, voice memo, note, and to-do list applications or other user-loaded applications that provide similar functionalities,

c. Performing internet, YouTube, and other applications' searches, through utilization of pre-loaded search and browsing applications or other user-loaded applications that provide

similar functionalities,

d. Photography, videography, and photo and video storage (i.e. albums), through utilization of pre-loaded camera and album applications or other user-loaded applications that provide similar functionalities,

e. Routing funds and managing funds, through utilization of banking, cryptocurrency, and shopping applications.

f. Directions and maps, through utilization of pre-loaded mapping, travel, and direction applications or user-loaded applications that provide similar functionalities, and

g. Storing password information necessary to review or access applications and accounts.

112. From my training and experience, I know that various cellular telephone applications – both pre-loaded or user loaded – record the cellular telephone's geographic location (and thereby the user's geographic location) and maintain logs of communications, such as call logs. From my training and experience, I know that a variety of pre-loaded and user-loaded applications on cellular telephones contain information that can aid in identifying the user of the cellular device. For example, such user attribution information can be found in photographic records, videographic records, voice messages, emails, texts, geolocation data, notes, calendars, to-do lists, maps, financial applications, shopping applications, and search and browsing records. From my training and experience, I know that internet protocol information is commonly found in cellular telephones and can identify geographic locations used by co-conspirators, which in turn can aid in identifying co-conspirators.

113. I submit that there is probable cause to search on the cellular telephone all applications that enable or contain data relating to voice, text, or email communications; note-taking and storage, including calendaring, voice memos, notes, and to-do lists; internet and

YouTube (and other applications') searching; photographs, videos, and albums; financial or shopping accounts; direction acquisition, travel information, and mapping; passwords; geolocation data; and user attribution data and to seize from the searched data evidence of the specified offenses.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

114. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet, such as construction company websites like OBRIEN is believed to have used, are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

115. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or

cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a

storage medium.

116. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

117. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

118. I submit that there is probable cause to believe that between July 2021 to March 2025, John OBRIEN (YOB 1997) committed violations of 18 U.S.C. § 1349 (wire fraud conspiracy) and 18 U.S.C. § 1343 (wire fraud). I therefore request that a criminal complaint and arrest warrant be issued for John OBRIEN.

119. Additionally, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICES described in Attachment A-1 and A-2 to seek the items described in Attachment B.

Respectfully submitted,

KURT RIPKE
Task Force Officer
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. **Sworn telephonically and signed electronically**

April 2, 2025

*Date*

*Judge's signature*

**Providence, Rhode Island**

*City and State*

**Patricia A. Sullivan, USMJ**

*Patricia A. Sullivan, U.S. Magistrate Judge*